## Strauch *against* Shoemaker.

It is essential to the validity of a title founded upon a warrant and survey as against an intervening right, that the survey shall have been returned within seven years; for otherwise, notwithstanding the property, which was unseated, may have been assessed and the taxes paid by the owner; that he used it as woodland for the purpose of supplying the farm on which he resided with firewood, rails and timber; that he claimed title, and this with the knowledge of the improver; yet after the lapse of seven years his right is for ever postponed.

When unseated land is sold for the payment of taxes, the title of the real owner, whatever it may be, passes to the purchaser, whether it be assessed and sold in his name, the name of the warrantee or a stranger, and whether the person in whose name it is taxed and sold has or has not any title.

ERROR to the Common Pleas of *Schuylkill* county.

This was an action of ejectment by John Strauch and John Klingeman against George Shoemaker, to recover a tract of land in Norwegian township, containing 174 acres.

Plaintiffs gave the following evidence:

1767, January 20th.—No. 2283, Application of Michael Lindermuth and John Melchior for 300 acres over the Second Blue mountain, adjoining the lands of Abraham Dely, Ellis Hughes, and said Melchior in Berks county, with directions to the deputy to execute the survey.

1806, April 18.—Survey under the same by Henry M. Richards, D. S. of 174 acres and allowance, adjoining lands of late John Melchior, John Neyfong, Vacant Mountain, and Ellis Hughes—the land in dispute.

1771, No. 74 of February Term. Record of a judgment in the Common Pleas of Berks county, and proceedings thereon at the suit of Henry Shoemaker against John Melchior, showing a sheriff's sale of land in Berks county, in the year 1771, by the following descriptions, to wit:—A certain undivided moiety or equal half part of a plantation and tract or piece or parcel of land, situate over the Blue Mountain in Berks county, containing 150

[Strauch v. Shoemaker.]

acres or thereabouts, be the same more or less—late the estate of John Melchior in the said writ named.

1771, August 3d. — Deed, Jacob Shoemaker, sheriff of Berks county, to Henry Smith, Jacob Winey, and Christian Lower, for one moiety of 150 acres or thereabouts, describing it as above, and sold as the property of John Melchior. Consideration, 19*l.*

1783, September 1st.—Deed from Henry Smith, Jacob Winey, and Christian Lower, to Michael Voyge, reciting the sheriff's deed. Consideration, 40*l.*

1805, May 27.—Deed of assignment, Michael Voyge to John Waggoner and Jonathan Lindermuth.

1805, May 28. — Deed, John Waggoner, and Jonathan Lindermuth to Henry Strauch and John Mowre, for same land. Consideration, 50*l.*

1813, April 3d. — Deed, John Mowre to John Klingeman, for his interest in the same land. Consideration.

Christian Lauderbrun sworn. I am the clerk of the Commissioners of Schuylkill county. These are office papers brought from the Commissioners' office of the said county.

1817.—Original assessment of lands in the township of Norwegian, for the year 1817, containing under the head of non-residenters, this entry:

Strach, Henry　　　|　　100 acres.　　|　　　$400 00.

1817.—Record Book of the tax assessed for the same year, 60 cents, and credit to collectors for same amount.

1820, June 17th.—Deed, John Schall, treasurer, to Jacob Hehn, Philip Foegley and Abraham Reifschneider, Commissioners of said county.

Jacob Reed sworn. I know the land that went by the name of Henry Strauch, it lay on the north side of the Sharp mountain; between that and Schuylkill there were no buildings on it, as far as I know of, from 1817 to 1820.

1826, October 25th.—Deed, John Zehner, Henry Shoemaker, and Ludwig Berger, Commissioners of Schuylkill county, to John Strauch.

1826, September 25th. — Conditions and acknowledgment of purchasers of public sale of lands by Commissioners.

Jacob Hammer sworn. I was Commissioners' clerk at the time of the sale and witnessed the acknowledgment of sale; I also witnessed the Commissioners' deed; I think Koehner mentioned at the sale that he bought for John Strauch, and requested the deed to be made to him. It was a public sale, agreeably to the conditions.

Matthias S. Richards sworn. I was the deputy surveyor of Berks County; those papers I found in the office of the deputy surveyor of Berks County; I do not know the hand-writing of the papers, except that there was some memorandums of my bro-

[Strauch·v. Shoemaker.]

ther's, Henry M. Richards, formerly deputy surveyor of Berks; I found these among the files of official papers of the office, when Henry M. Richards was deputy surveyor. He purchased from the widow Scull sundry papers, and these papers remained in his possession, and I became familiar with them as being called Scull's papers.; I frequently saw them in his possession, we looked upon them as connected with the office, but as his private property; upon the death of my brother Henry, I became his successor. In 1809, John M. Heyneman was appointed my brother's successor; he did not deliver over these Scull papers to Mr Heyneman as his successor; my brother was afterwards appointed deputy surveyor again; he bought these papers of the widow Scull, I think the widow of James Scull or Jasper Scull; they came from that source. Mrs Jasper Scull observed when we got the papers, that we should assort them, and if there were any private papers they should be destroyed, so as not to be exhibited to the public.

1767, January 20. — Copy of application directed by John Lukens, Esq. S. G., to John Scull, with memorandums on back.

1767, January 20.—Copy of application directed by S. Cochran, S. G., by S. Clendenen, to H. M. Richards, with endorsement.

Matthias S. Richards, again. I am in doubt whether the memorandum at the head is not my writing at an early day, when we were assorting the papers received of Mrs Scull; but I cannot reconcile this with the memorandums received per John Waggoner, 3d of July 1804.

1769, January 15. — Old field-notes, and three parts of old drafts.

Marks J. Biddle sworn. I do not know John Scull's handwriting, but I am inclined to think this was not his, for he was the son of Nicholas Scull, and a man of some education; and here the name of Michael is spelled Michel. Jasper got no papers but what came to the hands of his father, John Scull.

Defendants then gave the following evidence, to wit:

1816, April 1.—Warrant to George Shoemaker, 300 acres, adjoining lands of John Pott and others.

1816, April 27.—Survey thereon by John W. Roseberry, for James M'Farland.

1816, April 1.—Receipt of the treasurer, $80 purchase money, $5.50 fees.

1825, May 9.—Receipt, $11.04, balance of purchase money, &c.

1825, May 9. — Patent to George Shoemaker, for 302 acres, 120.

1825, May 16.—Deed, George Shoemaker and wife to Joshua Lippincott, for a moiety of tract.

1829, February 19. — Deed, George Shoemaker and wife, to B. W. Richards, for one-quarter of tract.

[Strauch v. Shoemaker.]

1828, July 3d.—George Shoemaker and wife, to B. W. Richards, for one-quarter of tract.

Plaintiffs, further to maintain the issue on their part, gave in evidence as follows, to wit:

Matthias S. Richards, called. (Looks at a paper)—This paper is in the hand-writing of H. M. Richards; field-notes and calculations of quantity; I found it in the office of the deputy surveyor of Berks county; field-notes and entry by H. M. Richards thereon, that $7 paid by Henry Strauch, &c.

1811, April 25th.—Entry in book of H. M. Richards, showing that the $7 fees were paid 25th of April 1811.

Plaintiffs then offered to prove payment of taxes from 1805 to the time of the sale to the commissioners, which was objected to by the defendants, as not rebutting, and the evidence rejected by the court.

Plaintiffs, further to maintain the issue on their part, offered to prove that Henry Strauch, from the survey up to the sale to the commissioners, lived within four miles of the land, cut saw-logs and other timber on the land; that it was known and called the land of Henry Strauch, and that George Shoemaker had notice of these facts. The court permitted the plaintiffs to prove any notice or knowledge that George Shoemaker had or received in relation to the title under which the plaintiffs claim, or in relation to any acts of ownership, with a claim of title which Henry Strauch exercised on the land, and residue rejected. To which the plaintiffs excepted.

The plaintiffs then gave the following evidence, to wit:

John Dreher sworn. Shoemaker came to me and told me that he believed that hill was vacant, and believed he would take out a warrant for it. I told him, as far as I knew, there had been an application in the neighbourhood, in the name of John Melchior, and it was very probable that was in his way; I think I told him he should go to old John Pott, who had the title to the application; I think I made a copy of the draft in the name of John Melchior, on the north side of Schuylkill; that was the only one I knew of, at the time I gave it to Shoemaker; he came back, and told me he had been to Pott, who showed him the drafts of which I had made him a copy; I made the affidavit for him to obtain the warrant, but I do not know whether this conversation was about that time or not; I cannot recollect what draft George Shoemaker took along with him to Harrisburg, after he made the application in order to obtain the warrant; I think it was the one I gave him; I have a slight recollection that at the former trial I had produced a draft, but of what land I do not know; I think at a subsequent time I produced to him a draft like one of these (the land in dispute.) It seems to me at one time that I told him or showed him a draft, and he said he did not care for it, it was not returned; when this was, I cannot say. The draft produced,

I think, was not in the same hand-writing, as that one produced; it seemed to me to be in the same shape of a survey; I think it was a private draft that belonged to me; I was not deputy surveyor then; I think Roseberry was deputy surveyor in 1816.

Cross-examined.—The John Melchior survey of which I spoke, is on the north side of Schuylkill, (looks at draft of survey made 17th of July 1766, for John Melchior.) This is the land of which I gave Mr Shoemaker a copy; I did not know whether it extended across Schuylkill or not.

This diagram, (referring to one,) I made last night; it shows the land in dispute, and John Melchior tract, to which I referred Shoemaker. At the time the land was taken up, I knew nothing of the Melchior and Lindermuth application.

Re-examined.—I think it was the John Melchior survey across the creek owned by John Pott, that I gave to Shoemaker to take along to Harrisburg; I think at one time when I surveyed the land there was a talk that old Henry Strauch owned the land, and we talked about it, and he said he did not care about it, for it was not returned.

I do not know that we had any conversation about it since; I do not know whether I surveyed it on the warrant or whether Roseberry did it; I had no knowledge of any title when I surveyed it; I investigated the lines after suit was brought; I do not recollect when the conversation was, but Shoemaker was along then.

Re re-examined.—(Looks at draft)—I do not know whether this is an official paper or not; the one from which I made the copy after the 7th of September 1818, was a copy in John W. Roseberry's hand-writing.

John Pott affirmed. I do not know of Shoemaker's having any knowledge of Strauch's claim prior to 1816.

Daniel Brittain sworn. I lived this side of Shoemaker's tavern, about one mile this side of Pottsville, a few rods from Shoemaker's, in 1816; I never heard Shoemaker say any thing about taking up land, nor any person in his presence, nor of this land being any person's else; I do not know that Shoemaker knew of Strauch's claim; he resided a mile or a mile and a half from the land.

Defendants then gave in evidence the following, to wit:

1816, March 27th.—Application of George Shoemaker.

1766, July 19.—Survey of John Melchior, on application, No. 1520, dated 21st May 1766.

The plaintiffs, further to maintain the issue on their part, offered to prove that the land was assessed and taxed as the property of Henry Strauch from the year 1805, up to the year 1817; that Strauch used it as his woodland for all the purposes of supplying his farm with wood, every year in that time, for fire-wood, rails, and timber to saw; that Shoemaker lived within one mile of the land all that time and in sight of it; kept tavern, and on the pub-

lic road; that Strauch passed from his residence to the land, and that Strauch and Shoemaker were all that time upon terms of intimacy, and that Strauch during all that time claimed title to the land.

This evidence was objected to as not being in order—not rebutting; and rejected by the court, to which plaintiffs excepted.

The plaintiffs requested the charge of the court, upon the following points, specifically:

1st. If the application under which the plaintiffs claim the land is descriptive of the land in question, and of which the jury are to judge, a levy and sheriff's sale of the one moiety thereof, owned by John Melchior in 1771, would be valid, and would pass the title thereto, although there was in fact no survey.

This proposition is correct, and has already been answered in the previous part of this charge. The purchaser would, however, be bound precisely as the original applicant would have been, to proceed with the diligence required by law to have his survey made and returned.

2d. Whether there has been an actual abandonment of the title under the application, is a question of fact for the consideration of the jury.

This is conceded to be true as a general rule. The court, however, do not think that in the present case it is so much a question of abandonment, as a question whether the plaintiffs have not lost any claim they had under the application, No. 2283, by negligence in not having the survey made and returned before George Shoemaker had obtained his warrant of the 1st of April 1816, and his survey thereon upon the 27th of the same month, which was returned into the surveyor general's office, on the 12th of September 1818, nearly two months before the survey on the application was returned by the deputy surveyor.

The third point is—If the land in question was unseated, and in 1817 was assessed with the payment of taxes in the name of Henry Strauch, and sold by the treasurer of the county for the payment thereof to the commissioners, and by them to the plaintiff, John Strauch, by such assessment the land is made debtor, and not merely the title of Henry Strauch; and such sales would pass a good title to the land in question to the plaintiff, John Strauch, upon which he is entitled to recover in this action, and any abandonment of the title under the application, cannot affect his rights; there being no evidence that the land was assessed in the name of any other person, or that any other person paid the taxes therefor.

To this proposition the court do not assent. If the title under the application had been abandoned or lost by negligence, so as to let in an intervening claim, a sale for taxes, (if the assessment and description of the land had even been such as would have

devested Henry Strauch and John Klingeman of their title, if they had acquired one such as took place here,) would not have devested George Shoemaker of the title he might have acquired under his warrant and survey. In other words, a sale for taxes under an assessment upon one title which fails, will not affect the title of the owner of a better and independent original title to the same land.

The facts of the case are submitted to you for your determination; the law you will take as laid down by the court. If our opinion of the law is erroneous, it will be corrected by a higher tribunal. Should you take the same view of the facts which the court have, then upon the law arising upon these facts, the defendants will be entitled to your verdict.

Errors assigned:

1. The court erred in rejecting the evidence stated in the 1st, 2d, and 3d bills of exceptions.

2. The court erred in their answers to the 2d and 3d points, upon which they were requested to charge the jury.

3. The court erred in referring to their own opinion in the case of Powell and Barrington—it having had no application to the cause trying, and having had a tendency to mislead and confuse the minds of the jury.

4. The court erred in giving it in charge to the jury, that if the land in question was assessed with the payment of taxes in the name of Henry Strauch, who was claiming to own the same, and sold by the treasurer of Schuylkill county, under the laws regulating sales of unseated lands for the payment of county taxes, such assessment and sale only disposed of the title of Henry Strauch, and if George Shoemaker then held a better title thereto than Strauch, such sale could not affect him, although he, Shoemaker, paid no taxes on the land.

5. The court erred in giving it in charge to the jury, that none of the provisions of the laws were complied with in the tax sale; and the charge is otherwise inexplicit, contradictory, and incorrect.

*Bannan*, for plaintiff in error. The evidence contained in the bills of exception, was offered to show that the original title of 1767 was not abandoned. There was an attempt made to survey it in 1769, as appears by the memorandum on the survey. In 1771 it was sold by the sheriff. In 1806, after the title had passed by conveyance, the survey was completed; and although not returned until 1818, yet the evidence showed clearly that Shoemaker knew the land had been appropriated. It was important for the plaintiff to show that he had paid the taxes for the land, and used it by cutting timber upon it, for that gave him that kind of possession which would be notice of his prior right. 9 *Watts* 111, 67; 17 *Serg. & Rawle* 350; 9 *Watts* 341. Nor was the evi-

[Strauch v. Shoemaker.]

dence thus offered out of place, for it was strictly rebutting. It was not necessary that the plaintiff should furnish evidence to supply the want of a return of survey until the defendant had shown his title.

But the sale of taxes is decisive. The point is clearly settled upon principle and by authority, that it matters not in whose name the land is sold, if it be otherwise identified as the land sold. It is the land which is debtor, and not its owner; it is the land which is sold, and not the alleged owner's title only. 2 *Watts* 390; 5 *Watts* 287; 13 *Serg. & Rawle* 360; 2 *Penn. Rep.* 496; 4 *Watts* 363; 7 *Serg. & Rawle* 372.

*Farquhar* and *Greenough*, for defendant in error. The evidence offered of the payment of taxes and cutting timber, could not supply the want of a return of survey, which is essential to the plaintiff's title. 1 *Penn. Rep.* 74, 454; 2 *Penn. Rep.* 384; 1 *Watts* 48; 4 *Watts* 140; 5 *Watts* 222; 5 *Watts* 524. The office of the surveyor-general is the only place to look for the existence of a title.

If the owner of land is to be bound by a treasurer's sale for taxes, it should contain such notice and description as to identify the land. The law requires publication of the sale, and of what avail would this be, if a sale may be made upon an advertisement which contains neither the name of the owner or warrantee? 7 *Watts* 490; 9 *Watts* 323; 13 *Serg. & Rawle* 150.

The opinion of the Court (Huston J. dissenting) was delivered by

ROGERS, J.—In several cases, particularly *Chambers* v. *Mifflin*, (1 *Penn. Rep.* 74) *Addleman* v. *Masterson*, (1 *Penn. Rep.* 454) and *Star* v. *Bradford*, (2 *Penn. Rep.* 393) it is ruled, that taking out a warrant, or application, and procuring a survey, without more, gives no title to land. That it is necessary for a warrantee, or applicant, not only to have a survey made, but he should have it returned. In *Star* v. *Bradford*, it is intimated that the time for returning a survey cannot, under ordinary circumstances, be extended beyond seven years; and that when the question of abandonment arises from mere lapse of time, where there is no dispute as to the length of it, it is a question of law to be decided by the court, without regard to the intention of the parties; that payment of the surveying fees will not dispense with the obligation to have the survey returned, for it is the warrantee's duty, notwithstanding, to have it returned. In *Brentlinger* v. *Hutchinson*, (1 *Watts* 52,) the same rule is recognised; and the policy of it is further enforced in *Zerbe* v. *Schall*, (4 *Watts* 138.) In the cases cited, more than seven years had elapsed; it was, therefore, unnecessary to go further than the cases called for. We now, however, think the time has arrived when some definite rule should be established, and, according to the intimation given, we take occasion to fix the period of time to seven years, in analogy to

I.—P *

the fourth section of the Limitation Act of the 26th of March 1786. Negligence, as is ruled in *Zerbe* v. *Schall*, respecting a return of survey, when the fees are not paid, is imputable to the owner; if they have been paid, it is imputable, in the first instance, to the deputy surveyor; but where the survey is made within seven years, the fault is imputable to the owner himself. To this principle an exception is made in *Star* v. *Bradford*, where the owner of the application has taken possession of the land and has made improvements upon it. It was supposed when this was done, he acquired an equity which it would be unjust to disturb, because of the neglect of either the deputy or himself, and because, from the nature of the transaction, and the notoriety of the possession, a subsequent improver must be aware that it had no cast of abandonment about it. The subsequent appropriation could leave no room to suppose that the warrantee had abandoned his title as unworthy of pursuit. Besides, where possession is taken, it is such an unequivocal act of appropriation, that it would be doubtful whether a locater would be at liberty to reject or retain the land, as he pleased, for an indefinite time. For these reasons the exception was made, but this is the extent of it, for nothing short of an actual possession will prevent the operation of the rule in favour of an intervening right. For notwithstanding the property, which was unseated, may have been assessed and the taxes paid by the owner, that he used it, as woodland, for the purpose of supplying the farm on which he resided with fire-wood, rails, and timber, that he claimed title, and this with the knowledge of the improver; yet, after the lapse of seven years, his right is for ever postponed to the intervening right which attaches to an improver or to the owner of a warrant with a survey. The same reasons which induced the decisions in the cases cited, apply in full force here. It cannot be endured that a person who has paid nothing shall be at liberty to hold the state bound for an indefinite length of time, while he himself is at liberty to reject or retain the land at his pleasure. The owner is chargeable with laches, for even the payment of the surveying fees does not release him from any further attention to the completion of his title. He is still bound, at all events, to see that the survey is returned, or he must be content to abide the consequences of his supineness and neglect. Justice to the state particularly requires that the rule be rigidly enforced. But although the evidence was properly ruled out for the reasons indicated, yet, it may be worthy of consideration, whether, on another trial, it may and ought not to be received as evidence of the identity of the tract, which is a material question in the cause.

The court instructed the jury, that a sale for taxes, under an assessment upon one title which fails, will not affect the title of the owner of a better, and independent original title to the same land; or, in other words they put the title of a purchaser at a

[Strauch v. Shoemaker.]

sheriff's and treasurer's sale on the same footing. The correctness of this part of the charge depends on the construction of the 5th section of the Act of the 3d of April 1804, which provides, " that sales of unseated land for taxes, &c., shall be in law and equity valid and effectual, to all intents and purposes, to vest in the purchaser, or purchasers of lands sold, all the estate and interest therein, that the real owner or owners had at the time of such sale, although the land may not have been taxed or sold in the name of the real owner." In *Luffborough* v. *Parker*, (16 *Serg. & Rawle* 351,) a sale for taxes was held good, when assessed in the name of Nathan L., and sold for taxes in the name of Nathaniel L. The variance was held to be immaterial; the Chief Justice remarking, that he could not perceive that the case was worse for the purchaser, than if it had been taxed and sold in the name of a *stranger*. Here it is plainly intimated, that whether the person in whose name it is sold has title, is immaterial. The same intimation is given by Mr Justice Huston, in *M'Cord* v. *Bergautz*, (7 *Watts* 490,) and *Morton* v. *Harris*, (9 *Watts* 323.) In *Caul* v. *Spring*, (2 *Watts* 396,) this language is used: " a sale of unseated land for taxes, vests the title, when regularly made, in the vendee, to the exclusion of all claimants to the land of a prior date." And in *Fager* v. *Campbell*, (5 *Watts* 288,) it is said, " the land itself, and not the owner of it, is debtor for the public charge; and it is therefore immaterial, at the moment of sale, what may be the state of the ownership, or how many derivative interests may have been carved out of it. With these the public has no concern. They are sold with the land, just as a remainder would be sold with the particular estate. In *Fager* v. *Campbell*, the sale for taxes devested the lien of a mortgage, and the principles on which the case was ruled apply with great force to this point. Thus the case stands on authority, and although some may suppose, which is at least doubtful, that the point is not directly decided, yet such a concurrence of opinion is indicated, as goes very far to settle the question. The land, and not the owner, is the debtor for the public charge; and this shows clearly the distinction between sheriff's and treasurer's sales. In the one, the thing itself is sold; in the other, the right of the debtor only. I have examined the section with some care, and it seems to me that it would puzzle the legislature to use language more significant and apt to indicate the intention that the complete title or ownership of the land sold, in whomsoever it may be vested, shall pass by the sale to the purchaser. The vendee acquires all the interest of the real owner, although the land may not have been taxed or sold in his name. This construction not only accords with the words of the Act, but the Act itself, so construed, is eminently calculated to benefit the county, the purchaser, and the owner himself. It greatly adds to the facility of collecting the county rates, by enforcing greater attention and vigilance in

their payment, it prevents a sacrifice of the property in conse-
quence of doubt as to the title, thereby benefiting both owner
and purchaser, and, what is of still more consequence, it confers
a lasting benefit on the public, by greatly aiding the improvement
and settlement of the country. It is said, that it may lead to
land cases. This is barely possible; but admitting the truth of
this assertion, yet individuals must yield part of their rights, to
advance the common prosperity. But in what does this danger to
the rights of individuals consist? A vigilant owner has nothing
to fear. All he has to do is to pay his taxes, and this he is bound
to do upon every principle of equality and justice. Nay, more,
when this has been omitted by him, the legislature has allowed
him to redeem his land within two years, terms by no means
onerous. There is then no hardship in his case, and he comes
with a bad grace to complain of a loss occasioned entirely by
his own negligence, or perhaps from a less justifiable cause, a
desire to escape from that equality in the burthens, which are
indispensable, and which have been imposed for his own, and
the public benefit.

When unseated land, which is the subject of taxation, is sold,
the title of the real owner, whatever it may be, passes to the
purchaser, whether it be assessed and sold in his name, the name
of the warrantee, or a stranger; and whether the person in whose
name it is taxed and sold, has or has not any title. I understand
the point was ruled by the able and learned judge of the Common
Pleas, because some doubts had arisen in respect to it. We fully
concur with him in the propriety of settling the question, as we
think it would be most unfortunate, if at this time, when the com-
monwealth is about to take a new start in the career of improve-
ment, any suspicion should be cast upon the numerous titles
which are held under treasurer's sales. The court is therefore
of opinion that the judgment be reversed, and a *venire de novo*
awarded.

Huston, J.—The affairs of this world are apt to run into ex-
tremes. From the settlement of the province until since 1815,
no sale made by commissioners, treasurer or sheriff, for taxes,
was ever held valid, nor did any purchaser hold the land under
such sale, unless lapse of time made his title good. This was
found to be a great evil; after the purchaser had made the land
valuable by improvements, the former owner, or oftener some
neighbour using his name on a speculating contract, swept away
the labour and land from the purchaser.

To remedy this state of things the Act of 1815 was passed,
which prescribed that sales of unseated land, for unpaid taxes,
should be made on a certain day in June every two years —
allowed the former owner two years from the sale within which
he might redeem—and if not redeemed within that time, dispensed

[Strauch v. Shoemaker.]

with the proof which had been formerly required of the election and qualification of assessors, commissioners and treasurers—with proof of regularity of all acts done by each of them—with productions of all the newspapers (four of them) in which the lands were advertised, as directed by law, for weeks or months—in short, with *proof at the trial*, that each minute direction of the Acts of Assemby had been complied with;—and it was thereby " declared that so much of the Act to which this is a supplement, as requires notice of the taxes being due, and sale thereon, to be given in certain public newspapers, is repealed, and no alleged irregularity in the assessment, or in the process, or otherwise, shall be construed or taken to affect the title of the purchaser." Several decisions of this court have given full and fair effect to this law.    At length cases occurred going to show that enormous frauds were attempted, under the idea that any sale by a treasurer would be held to pass the title; lands taxed as seated, this appearing by regular evidence in the commissioners' office, were sold as unseated; lands never assessed as unseated, nor taxed as such, nor advertised at all, were handed to the crier and sold; the sale entered by the treasurer in his list of sales, and a deed made to the purchaser, without further inquiry.    These sales have not been decided to be valid.    But we have repeatedly decided that it must appear that a tax was assessed by the commissioners, though it was not necessary to show it in all or any one respect regular; in other words, that the treasurer, who, either through negligence or for a worse reason, sold lands never assessed at all or never assessed or advertised as unseated, passed no right by his deed.    4 *Watts* 363.

In *Morton* v. *Harris*, (9 *Watts* 319) we had a case differing from any prior one formerly decided.    In 1811 and until 1813, when he sold it to one under whom defendant held, Christian Leonard owned a tract of patented land containing 328 acres 51 perches, and also three other tracts, the quantities of which added together amounted to 1030 acres.    These four tracts had been assessed separately and taxed separately, each for its proper quantity; but were advertised and sold as one tract, 1030 acres, the property of Christian Leonard.    The purchaser conveyed the patented tract to John H. Harris.    Defendants had entered on the land under the conveyance from Leonard made in 1813; this entry was after the treasurer's sale under which plaintiff claimed. This court decided that the deed under which plaintiff claimed passed no title to the purchaser from the treasurer's sale.    The written opinion contains the conclusions of the judge who wrote it; and those reasons may be all or only part of the reasons on which the whole acted.    The conclusion that the sale vested no title is the decision of the whole court.    The directions that the treasurer shall advertise each tract for a certain length of time are not repealed by the Act of 1815; but the necessity of proving

I.—23

the regularity and continuance of the advertisements is dispensed with from the expiration of two years after the sale. Landholders at first complained of that law as harsh in its provisions; but it was necessary. It is not necessary that courts should carry the law, by construction, further than its letter and spirit will warrant. It provides that sales for taxes shall take place biennially on a certain day in June, so that each landholder may examine and see if his lands will be sold. It provides that advertisements specifying each tract shall be published a certain length of time in the county and in two daily papers in the city of Philadelphia. These provisions were intended to leave the land owner without excuse, if his land was sold and not redeemed, and thus lost to him: but if the advertisement contains nothing to induce a suspicion that his land is advertised and will be sold—if, on going to the county within two years and examining the lists of sales, he is unable to discover that it has been sold, and thus cannot redeem it—and yet his land is taken from him—it would be what the law did not intend; it would be producing injustice where the law and law-makers intended none; it would be turning the provisions of the law, intended fairly and honestly to give notice, into a fraudulent and deceptive means of depriving a man of his property. The law does not confiscate a man's land although he does not return it to the commissioners, and they do not know of it and do not tax it. The Act of 1806 directs that if land is not returned by the owner and not taxed, a fourfold tax may be assessed on it when discovered; this penalty may be imposed, but no other.

The act of the 3d of April 1804 makes it the duty of the deputy surveyor to return, on application of the commissioners, a list of all warrants and orders of survey executed by themselves or their predecessors, of the number of acres in each survey, the waters on which it lies, and the township, if known, and the names of the original warrantees. All this, and the manner of the advertisements required by law, show an intention to remove all pretence of want of notice to the owner, and to enable the assessors and commissioners and treasurer to designate what is taxed; to enable owners to pay or redeem within two years, and the purchaser to know what he has bought, and to take possession of it. Let it be recollected that the Act of 1815 does not dispense with any of these requisitions, but dispenses with proof that every thing was done in the time and manner prescribed, unless the suit is brought within two years—after that period the landholder cannot require proof of the election and oath of assessor, or commissioners, or treasurer, or the production of all the newspapers in which the lands were advertised; but says nothing to excuse such designation of the specific tract as will comply with the spirit and meaning of the law, and give notice to the owner and purchaser of what is taxed and what is sold, and must be redeemed, or lost; when the owner redeems, he must pay all costs; if the advertisement

[Strauch v. Shoemaker.]

gives no notice, if it is not necessary that it should give any no-
tice, why does the law require it? why must the owner pay the
expense of it?

But it is said the 5th section of the Act of 1804 cures this. It is,
"Sales of unseated lands for taxes now due, or that may hereafter
become due, made *agreeably to the directions of this Act*, shall be in
law and equity valid and effectual to all intents and purposes, to
vest in the purchaser of *land sold as aforesaid*, all the rights and
interest therein, that the real owner thereof had at the time of
such sale, although the land may not have been taxed or sold in the
name of the real owner thereof." It will be observed that this does
not apply to the designation of the identical tract sold, but to the
ownership of such tract. It will be also recollected that the com-
missioners are required by the first section of the act to give the
name of the warrantee or person to whom each tract was granted,
and the number of acres surveyed on such grant. By the second
section, all unseated lands owned by individuals, companies or
bodies corporate, shall be taxed, &c., &c. If the commissioners
knew the owner, it might be, and was, and is generally charged
to him on the commissioners' books : but the owner last year may
have sold, and the commissioners may not know this, and sell it
as the property of one who is not the owner : to guard against the
effect of such a mistake, the fifth section above was enacted. If
the warrantee is named, it is immaterial whether the name of the
owner is correct or not. The name in which it was originally
granted generally designates the tract beyond mistake. In some
parts of the state, the No. of the warrant designates the specific
tract sold, and this is the substantial and conclusive ground of
*Luffborough* v. *Parker*, (16 *Serg. & Rawle*.) The No. of the tract
and the range of donation land in which it lay, designated the tract
sold beyond the possibility of mistake. That case presented a
question totally different from this. The tract there was identi-
fied ; no dispute what tract was sold. The question was, whether
the advertisement gave legal notice to the owner. Here the
question is, did the advertisement of a tract of warranted land,
of Henry Strauch, 100 acres, give any notice to George Shoemaker,
the owner of a tract warranted and surveyed to himself, containing
300 acres. If it is said the description in the assessment, "war-
ranted," is not material, I ask, if this land in the same sales had
been taxed and advertised and sold as land held on a location to
Michael Lindermuth and John Melchior, and the two purchasers
contended for the right, would not he who bought under the true
description have held the land? On this part of the case I would
refer to the case of *Sheaffer* v. *M'Kabe*, (2 *Watts* 421.) If the doc-
trine contended for in this case is held to be correct, a great part
of what is written by the Chief Justice in that case, is wrong.

But to come to the case in hand. Until Shoemaker took out
his warrant, I admit that Strauch might have had his survey re-

turned.   On the 1st of April 1816, Shoemaker took out his war-rant, which was surveyed in the same month; after this Strauch's right to that land, and all pretence of right, was irrevocably gone. See *Zerbe* v. *Schall*, (4 *Watts* 140) and cases there cited; *Steinmetz* v. *Logan*, (5 *Watts* 524.)

This right being extinct, so that Strauch or a purchaser from him could never recover—so that if levied on and sold by the she-riff for a debt the purchaser could never recover; how can this purchaser recover?   Shoemaker's right was not sold, or pretended to be sold.   The tax for which Strauch's right was sold was as-sessed in 1817, after he had ceased to have any colour of right.   On what principle of law, justice, or reason, can a sale of a void right give a good title?   But it is said the land is taxed, not the title. To a certain extent I admit this; but the assessment and adver-tisement must show what land it is which is taxed and sold, otherwise assessment and advertisement are worse than useless, and had better be abolished.   No case can show the effect of this doctrine more strongly than the present.   In 1817, Henry Strauch knew his right to this land was gone; he lived near; he saw it advertised and sold in 1820, and again by the commissioners in 1826; he does not redeem, though $15 would have restored his right; but he knew that right was worthless: of his own inge-nuity, or on cunning advice, he held back, but his son employs a man to buy for him, and for $15 given for a worthless claim he is to take what Shoemaker had a good right to, and for the half of which right Lippincot had paid $2500, and he lies by until an-other purchaser gives $4000 for the other half.   And it is now contended that a purchase of a worthless title destroys and overcomes a perfectly fair and legal title, and all this without the owner of the valid title having any knowledge or notice of what was going on.   I can never agree to a decision founded on such prin-ciples, and producing such effects.

Judgment reversed, and a *venire de novo* awarded.