## Burford *versus* McCue.

1. It was error to submit to the jury without other proof, the question whether "R. P. O'Neil" who executed a deed was Rev. Patrick O'Neil, the owner of the land.

2. Burford and McCue each had surveys returned on the same land; Burford's was rejected and McCue's accepted by the board of property, and Burford appealed. *Held,* that although Burford was in actual possession, yet he must stand as other plaintiffs in ejectment on the strength of his own title, not on the weakness of the defendant's.

3. The successful party before the board of property is to be considered as in possession on an appeal, and showing an outstanding title would be a sufficient defence.

4. Presumption of abandonment by neglect to return a warrant for twenty-eight years, is rebutted by the possession of the land by the warrantee and tenants during the time.

[Burford *v.* McCue.]

5. The possession is notice of the appropriation of so much land, as the settlor may include by his settlement.

6. The warrantee is presumed to have paid the purchase-money on obtaining the warrant, on the ground that the law requires the payment then to be made, and the presumption that the state officers have done their duty.

7. When the testimony is not brought up by bill of exceptions, it should be certified to be correct by the judge who tried the case; the practice of counsel making different presentations of the evidence is erroneous.

Error to the Court of Common Pleas of *Armstrong county.*

Ejectment, commenced July 5th 1864, by James Burford against Stephen McCue. The land in controversy lay on the north and west of the Allegheny and Ohio rivers and the Conewago creek, and contained about 41 acres.

Abraham Yokey settled on a vacancy some time previously to 1812, put up a mill with other buildings, and made other improvements; he cleared and cultivated several acres of land, raising grain annually, and from the proceeds of the mill and his farming supported his family.

Nathaniel Patterson's land was on the south of Yokey's settlement, and Yokey claimed to Patterson's line. There was evidence that this line was agreed to by Patterson and Yokey as their division line, and that Yokey had cleared up to it. This claim of Yokey covered the land in dispute. Yokey's right was sold by the sheriff, and conveyed to A. Cravener on the 25th of December 1830. Cravener sold to Rev. Patrick O'Neil about 1833; he applied for and obtained a warrant for 110 acres on the 2d of April in that year. There was evidence that O'Neil by himself, his brothers Francis and Barney, and tenants kept possession, and farmed the land until about 1862 or 1863, when they were "chased away by Burford and his sons." The land was assessed in the name of Francis O'Neil, and sold for taxes June 11th 1860, to Robert Patten. O'Neil's warrant of April 1833 was executed April 9th 1862, and returned September 10th following.

On the 27th of March 1863, Patten conveyed his tax title to McCue, the defendant.

The plaintiff showed also an assessment of the land to Francis O'Neil, a sale for taxes to Joseph Brown, June 18th 1842, a settlement by plaintiff in 1858 (continued till trial), warrant to him for 49 acres March 18th 1862, survey under it for 41 acres and 52 perches and allowance, the land in dispute; also deed dated February 27th 1863, from "Joseph Brown" to the plaintiff for the tax title of Brown. There was evidence that Joseph Brown the purchaser had been dead many years before the date of the deed. McCue entered a caveat against granting a patent to Burford, and on the 20th of January 1864, the board of property rejected Burford's survey, and accepted McCue's.

On the trial the defendant offered a power of attorney from "R. P. O'Neil," of Waukesha, Wisconsin, to William Gallagher

[Burford v. McCue.]

dated September 9th 1861, authorizing the sale of the land, and a deed "Rev. R. P. O'Neil," by his attorney in fact, William Gallagher, to Stephen McCue, dated January 20th 1862, for the land in dispute, which were separately objected to by the defendant, received by the court, and exception taken.

The plaintiff submitted a number of points to the court, which, with their answers and a portion of the charge, are found in the assignment of errors hereinafter stated.

There was a verdict for the defendant.

The plaintiff assigned for error the admission of the evidence as above stated; also the answers to his points, and part of the charge of Buffington, P. J., as follows:—

1. In answering the 5th point, viz.: "The power of attorney to Wm. Gallagher, Esq., from R. P. O'Neil, and the deed in possession thereof, to defendant, confers no title upon the defendant."

Answer: "We cannot answer this point as requested. Whether the O'Neil, in the power of attorney, was identical with the warrantee, is a question of fact for the jury; and as such is submitted to them. If the same person, then the power and deed would be good. If a different person, then it would be unavailable as a conveyance."

2. In charging the jury: "I am impressed with the opinion that the treasurer's sale to Brown, and from him to the plaintiff, is not of very controlling importance. If the land was unseated, and not within the claim and possession of O'Neil, it was vacant land of the Commonwealth, and not subject to sale. Again: if it was embraced in the warrant, and subsequently abandoned, that abandonment would be to the Commonwealth, not to the purchaser, and the land would not be subject to sale for taxes. Still, as it is desired that the question presented should be reviewed by the Supreme Court, we have considered the effect of the alleged redemption by O'Neil. If Brown, after the time for redemption had passed, received the money from O'Neil, and agreed it should be a satisfaction and extinguishment of his right; in that event, it would turn Brown into a trustee for O'Neil, and would confer upon him the title, as this case would not be within the Statute of Frauds."

3. In answering the 3d point, viz.: "The warrant granted to P. O'Neil, dated 2d April 1833, and never executed by survey and return until April 1862, is in law abandoned; and the survey thereunder confers no title, unless the warrantee took actual possession under said warrant, and continued the same by himself and those legally claiming under him, up until the execution of said warrant, having his lines and claims designated and marked."

Answer: "We cannot answer this point as requested; depending so much upon facts. An actual possession by the warrantee

[Burford *v.* McCue.]

would rebut the presumption of abandonment, though not taken in pursuance of the warrant, if continued from time to time, and not legally relinquished."

4. In answering the 4th point, viz.: "Defendant has shown no title, derived legally from Abraham Yokey, the alleged settler of the land; and therefore cannot recover."

Answer: "This point is answered in the negative. Although defendant has failed to show the intermediate chain of title between Yokey and O'Neil, still he may recover upon the warrant of 1833, with accompanying possession."

5. In answering the 6th point, viz.: "In the absence of legal evidence connecting defendant and those under whom he claims, with the title of the original settler, Abraham Yokey, and their possession with his; there is no such possession as will save the warrant from legal abandonment; and the survey of April 1862 confers no title upon the defendant."

Answer: "This point is answered in the negative."

6. In answering the 7th point, viz.: "If the jury believe, from the evidence of James Stewart, Esq., Thomas Burns, Peter Yokey, Henry Swartzlander, John Yokey and others, that Abraham Yokey marked a line on the ground, limiting his settlement, and thereby excluded the land in dispute, and that afterwards the plaintiff went upon the land thus excluded from Yokey's claim, and took out a warrant and proceeded with proper diligence to have the same executed by survey and return; in that event, the plaintiff will hold the land in dispute."

Answer: "This point is answered in the affirmative; provided, defendant has shown a connection with Yokey. But plaintiff cannot claim for one purpose, that the right of Yokey is not vested in defendant; and again, that defendant is to be prejudiced by acts of Yokey limiting his claim."

7. In answering the 8th point, viz.: "If the jury believed, from the evidence, that James Burford was in the actual possession of the land in dispute at the bringing of the action, and has continued that actual possession until the present time, he is entitled to all the rights of a defendant in ejectment; and McCue is to be treated as the substantial plaintiff in this case."

Answer: "We cannot answer this point as requested. This ejectment is to be subject to all the rules that prevail in actions of ejectment."

*Golden & Neale* and *J. Boggs*, for plaintiff in error, cited Strauch *v.* Shoemaker, 1 W. & S. 166; Starr *v.* Bradford, 2 Penna. R. 384; Roland *v.* Long, 1 Harris 469.

*Fulton & Painter*, for defendant in error.

[Burford v. McCue.]

The opinion of the court was delivered, January 7th 1867, by

THOMPSON, J.—The exceptions to the admission in evidence of the power of attorney executed in the name of "R. P. O'Neil," and to the deed to the defendant, made by the agent under its authority, as well as the answer of the court to the plaintiff's 5th point on the effect of these instruments, first claim our attention in this case.

The objection to the evidence was, that the power of attorney did not primâ facie purport to be executed by Rev. Patrick O'Neil, whose title was to be transferred under its authority. In the body of the letter of attorney he calls himself R. P. O'Neil, of Waukesha, Wisconsin, and his signature is appended containing the same initials. The magistrate who took the acknowledgment certifies that, " personally appeared before the undersigned, the above R. P. O'Neil, to *me known to be the person who* executed the above and within instrument," &c.

The learned judge felt the force of the objection, that a power of attorney in this name, was not an authority for passing by deed, Patrick O'Neil's real estate, and referred it to the jury to say, whether the R. P. O'Neil described in the power of attorney was the Rev. Patrick O'Neil. But there was not a whit of testimony to aid them in the investigation excepting the power itself; and to refer a fact to the jury without evidence is error.

But it was argued, that the jury might infer that R. P. O'Neil stood for *Rev.* P. O'Neil. That the letter R. in the signature stood for " Rev." and was not an initial in the name. But this could not be presumed, unless some habit of so using it had been shown on part of " Priest O'Neil," as he was called. The initials preceding a surname in a signature are always understood to be the initials of a name, and not the abbreviation of a title, unless proved to be the former and not the latter. There was no proof at all of this. As the case stood, therefore, without proof of identity to submit to the jury as a question of fact, we think the court erred in submitting the instrument to the jury at all. But if received with a view to see whether the trial might not develop the fact of identity, and this failed, then it was the duty of the court either to strike out the testimony, or instruct the jury that it was to have no effect; and because this was not done by the learned judge there was further error. As the case stood, without explanation, it was the duty of the court to have said the deed was not executed by the Rev. Patrick O'Neil's authority, and to have rejected it. Whether an instrument be executed or not, is in the first place for the court; as the deed in question was not proposed to be followed with proof of handwriting or other identity, the court had a plain duty to perform, and that was to reject it— not appearing to have been executed by authority of Patrick O'Neil.

[Burford *v.* McCue.]

But as this controversy stands, the objection noticed is not destined to affect the result of the case. The plaintiff was entitled only to recover on the strength of his own title, and not upon the weakness of that of his adversary. The latter having the peaceable possession, and claiming under a settlement, warrant and survey, all prior in time to the inception of plaintiff's title, he could only be put out of possession by force of title. This made it necessary for the plaintiff to establish title in himself. This he tried to do before the board of property and failed; and it was incumbent on him to do it before the court and jury, or fail to get the patent. But if, on the trial, it appears that the title is not in him, but in some third person, his discomfiture in the attempt to recover possession by force of title would be as complete as if it had been in the defendant's own hands.

There was testimony to show a purchase by Patrick O'Neil from one Anthony Cravener about 1830, of the settlement-right acquired by him from one Abraham Yokey, the settler, by a sheriff's sale, and possession by O'Neil for over twenty-five years before the plaintiff's title began. The plaintiff claimed under a settlement on the 40 acres in controversy in 1858, or about that time. If the O'Neil settlement-right covered the land in controversy, and was otherwise good and subsisting, it would, as an outstanding title, sufficiently shield the defendant, as already said.

Anticipating difficulty, doubtless from this source, and in order if possible to obviate it, the plaintiff's counsel asked the court below to hold, that his client being in possession of the land in controversy, ought to be regarded as a defendant in ejectment, with the advantages incident to that position. The court would have erred if they had conceded that.

The Act of 3d of April 1792 regulates proceedings on *caveats* before the board of property, the effect of a decision by the board, and the time within which the losing party must institute ejectment before being barred by its decision. That period is six months; and his opponent, the winning party before the board, is to be considered in the actual possession of the land. The ejectment is in the usual form, and to be maintained in the usual way where title is in issue; consequently the plaintiff must recover on the strength of his own title. As the Commonwealth's grant of title is to follow the result of the trial at law, it would seem to be of the first consequence that the plaintiff should establish title in himself. The effect of an outstanding title should certainly be no less potent in an ejectment following a decision of the board of property, than it is in any other trial of title in ejectment. The defendant was not bound to show his hand at all, until the plaintiff made out at least a primâ facie case. The development of an outstanding title would be sufficient for the defence.

[Burford *v.* McCue.]

That there was an older title to the land in question, if not lost in some way, so plainly appears, that I do not see how it could be disputed. The land lies north and west of the Allegheny and Ohio rivers and Conewango creek, within which is, by pre-eminence entitled to be denominated, the *actual settlement district*. By the Act of 3d April 1792, a settler can acquire title against all the world, excepting the Commonwealth, by complying with the terms of settlement prescribed by the act, on any unappropriated lands. That consists in clearing, fencing, and cultivating two acres for every hundred intended to be embraced by the settler, not exceeding 400 acres and allowance; building a house thereon fit for the habitation of man, and residing, or causing a family to reside thereon for five years. The terms are the same for any less number of acres settled upon.

Yokey, it appears, settled on a vacancy of about 121 acres, a part of which is now in dispute, not far from the year 1804; erected thereon a cabin and lived in it with his family for many years, as already mentioned, until sold out for debt. During this time he cleared, fenced and cultivated 7 or 8 acres or more of land, and built a grist-mill on it. The learned judge was of opinion that his settlement had been completely made out. Indeed this was not denied, but only that his right under the settlement did not extend to the entire vacancy. Cravener bought the settlement-right of Yokey, and it was proved that O'Neil bought from him in 1833, and entered into possession in that year; and by himself, his brothers and tenants, has kept possession and cultivated the land and used the mill ever since, until "driven away," says Francis O'Neil, "in 1862 or 1863 by Burford and his sons." In addition to this, O'Neil in 1833 applied for a warrant for the land covering the entire vacancy, describing it by its adjoiners, as containing 110 acres or thereabouts, interest to commence in 1804. This warrant was executed by a survey on the 9th of April 1862, and was returned 10th September 1862. The survey and return covered the entire vacancy settled upon by Yokey. This was O'Neil's title, outstanding as against the plaintiff.

The plaintiff's title commenced in 1858 by settlement on part of this vacancy, on the assumption that Yokey had excluded from his settlement the 40 acres in question. On this settlement the plaintiff procured a warrant dated the 18th March 1862, which was executed by survey on the 5th September 1862, and returned the same day with that of the defendant. The interference between these warrants being noted by the county surveyor in his returns, operated as a *caveat*, and brought the case as noticed, before the board of property, where it was determined in favor of the defendant. The facts of the settlement, warrant and continued occupancy on part of the defendant, and those under

3 P. F. SMITH—28

whom he claimed, and that the warrant covered the land in question, was put beyond question by the testimony as well as the fact that O'Neil's warrant and survey covered the entire vacancy. One, and perhaps the main ground, upon which the plaintiff claimed to recover the 40 acres, was, that the O'Neil warrant, not having been returned for so long a period, nearly twenty-eight years, was to be presumed to have been abandoned, and the land again open for appropriation by settlement and warrant. This is the substance of the plaintiff's 3d point. This ground seems to concede that the O'Neil's warrant and settlement covers the land claimed by the plaintiff under the settlement and warrant.

The learned judge refused to charge as requested, and instructed the jury that the possession of the warrantee by himself and tenants rebutted the presumption of abandonment. This was correct beyond a doubt. In Strouch *v.* Shoemaker, 1 W. & S. 166, this point is discussed and determined. Rogers, J., in delivering the opinion of the court, after referring to the question of laches in not returning a warrant, says: " To this principle an exception is made in Star *v.* Bradford, 2 Penna. R. 384, where the owner of the application had taken possession of the land and made improvements on it. It was supposed, when this was done, he acquired an equity which it would be unjust to disturb, because, from the nature of the transaction, and the notoriety of the possession, a subsequent improver must be aware that it had no cast of abandonment. The subsequent appropriator could have no room to suppose the warrantee had abandoned his title as unworthy of pursuit." Continued possession and improvement is the very opposite of abandonment of a warrant obtained on a settlement. The rule requiring vigilance in returning the warrant does not apply to such a case. Nobody, who does not desire to be misled as to the fact of the appropriation of land, can be when he sees the settler in possession, clearing, cultivating and improving the land. The possession is notice of the appropriation of so much as the settler may include by his settlement. As the return of the warrant is for the purpose of notice that the land is appropriated, the rule ceases with the reason for it.

The assumption that the purchase-money for the warrant was not paid by O'Neil when he obtained it is not correct. It is against the law on the subject, and the presumption that the state officers have done their duty. Since the Act of 1794 warrants must be paid for before being issued; and for this purpose the surveyor-general is by Act of 1809 to furnish the applicant for a warrant with a calculation of the amount he must pay into the treasury for the land embraced in his application with interest; four dollars for the warrant and fifty cents for the calculation. Twenty cents per acre, with interest from the date of settlement, must have been paid by O'Neil on procuring his warrant, together with office

[Burford *v.* McCue.]

fees. No presumption could arise as to abandonment on this score, even if possible, which it is not, where there is possession accompanied by improvements, payment of taxes, and the like.

The plaintiff's 6th point claimed the law to be, " in the absence of legal evidence connecting the defendant and those under whom he claims with the title of the original settler, and their possession with his, there was no such possession as would save the warrant from legal abandonment." The court in general terms refused to affirm this ; and in this we think they were right.

From what has been said, we think it clearly enough appears, that no presumption of abandonment arises in the case. It would be enough to prevent this result that the defendant claims under the warrantee, and continues the possession under his title.

The answer to the 7th point is also complained of. It must be admitted that it is in substance a negative of the point by reason of the countervailing qualification. I do not understand that the witnesses named prove the marking of a line by Abraham Yokey, excluding from his settlement the land claimed by the plaintiff. What Yokey said was, at best, but loose conversation, or remarks, in regard to where he supposed his lines to be, under a belief, then and there expressed, that the place where he spoke of as his boundary, he supposed was the line of an adjoining owner south of him. In this he was mistaken. But no matter for that ; the successor to his title as settler, twenty-five years before the inception of the plaintiff's title, procured a warrant, as the settler might have done, for the whole vacancy, and being founded on the settlement, was necessarily descriptive, and it gave title as against a later warrant, from its date. Any answer to the point leaving out this view of the case would have been error. *Qui prior est in tempore potior est in jure,* is applicable to this as other cases. Conceding the answer a negation of the point, it was right.

The last thing to be noticed is the treasurer's deed for the land in dispute, given in evidence by the plaintiff ; and while we cannot agree with what the learned judge said on the subject, still, under the uncontradicted evidence in the case, we do not think there was such error as upon which we should reverse this judgment. Without discussing the particulars of the error believed to have been committed, it is enough to say, that the land was so indisputably seated, and had been for at least thirty-five years, that no sale as unseated would pass title. This would be the inevitable answer to this deed, presented when it might. Indeed, the preponderance of the testimony went to establish the actual occupancy of the land during the very years, for the taxes of which it was sold. Indisputably this was so for the year preceding, and many years anterior thereto, and since. The whole vacancy was claimed by the occupants under the settlement and O'Neil's warrant, which covered the whole vacancy, and during

[Burford *v.* McCue.]

the occupancy the property and person of the occupier would be liable for the tax. Even if the possession had been derelict for the years for which the taxes under which it was sold had accrued, this would not have changed it to unseated land: 2 Harris 128; 2 Watts 124. This being so, it was not at all material whether there was an occupant, or property on the premises sufficient to pay the taxes or not: 4 Barr 214. Indeed, but for the order of testimony, the transfer of the treasurer's deed ought not to have been admitted at all. The testimony very conclusively shows that when it was made the owner had been dead many years. Whether there was an attempt to simulate his handwriting we need not say, but there was not a scrap of authority shown in any one to make the transfer, if Joseph Brown was dead, as he undoubtedly was, and for this reason the deed might have been ruled out after its admission. It may be said that these things are all for the jury, and generally they are. But we are asked to send back this case for an error which, if corrected, could do the plaintiff no good, for he would be sure to encounter more signal defeat on grounds that existed but were not invoked; viz., the seated character of the land.

I notice in this case a practice which we have often complained of elsewhere. We have different presentations of the testimony by the different counsel. We cannot tell which accurately represents that given on the trial. In all cases where the testimony is brought up independently of a bill of exceptions, it should be certified as being correct by the judge. When there is a bill of exceptions, it is necessarily so. We hope the attention of the profession will be given to this in future.

Judgment affirmed.