## Harper *against* M'Keehan.

The occupation of part of an unseated tract of land which is defined by lines marked upon the ground, and held under an independent and adverse title, will not affect a treasurer's sale of the residue of the tract for the payment of taxes.

Two adjoining tracts or pieces of unseated land, which the owner purchased at different times, and had a survey made including both, may be assessed, taxed, and sold by the treasurer as one tract for the payment of taxes.

It is not essential to the validity of a treasurer's sale of unseated land, that it was assessed and sold in the name of the true owner, if it be clearly designated by any other mark.

If unseated land of minors be selling for taxes, and a friend of the family buys it with his own money, and takes a deed to himself in trust for the minors, and gives his own bond for the surplus purchase money, the title thereby made is as good and effectual as if no such trust had been expressed in the deed.

ERROR to the Common Pleas of *Perry* county.

John Harper against John M'Keehan.

This was an ejectment for 380 acres in Carroll township, first brought in the name of John M. Woodburn, in whose place John Harper was afterwards substituted. The plea of not guilty was put in for Mathew Irvine's heirs; and afterwards, on the second day of the trial, defence was taken " for the land embraced in the blue lines, and the 49 acres 33 perches in the name of Wolff, in the diagram filed."

The plaintiff produced a warrant to John Loque for 400 acres, dated 16th May 1794, adjoining Robert Sterrett, and a survey thereon, on 12th September 1794, of 437 acres 72 perches, returned 26th February 1801. This land was returned by the deputy surveyor to the commissioners of Cumberland county, and was assessed as unseated, in the name of John Loque, for the years 1796 till 1809; and was sold by the treasurer to the commissioners on 15th June 1824, for $9.82½.

On 4th September 1809 there was a credit for each 85 cents in full of taxes on 57 acres 100 perches sold by him to George Loque. The 57 acres 100 perches are deducted from the 437 acres 72 perches, leaving 379 acres 132 perches, (the quantity sold). A treasurer's deed was made to the commissioners, who sold the

[Harper v. M'Keehan.]

same land to Woodburn for $42, by deed dated 4th July 1831. Deed from Woodburn to Harper, dated 31st November 1838.

The defendant offered in evidence deed dated 2d February 1811, George Loque and wife to Mathew Irvine, to be followed with proof of a regular assessment of the land in the name of Mathew Irvine, for the year 1832, and sale of the land for taxes to the defendant by the treasurer of Perry county; and with proof that the land was the same as that in dispute. It was objected that the deed recited no title, and did not embrace the land in dispute, and that no title was shown in the grantor. The deed was not offered to show title, but merely as a sufficient authority to the assessor to assess it in the name of M. Irvine. The objection was overruled, and exception taken by the plaintiff, and deed read for 352 acres 37 perches by courses and distances, adjoining heirs of Godfrey Sidle, George Loque, other lands of M. Irvine, and vacant land. No title was recited.

The defendant, having proved the assessment book of Rye township for 1832, offered to read from it the assessment in name of M. Irvine, 500 acres mountain land for 1832, tax $1.50, val. $900; together with the settlement made with the collector, in which this tax was allowed him. It was objected that this did not purport to be an assessment of unseated lands at all, but an assessment of lands and personal property subject to taxation in the county; that the entry itself was unmeaning, unintelligible, altered and illegible; the paper called a settlement was not competent to prove the land unseated; and that the evidence did not purport to embrace the land in question. These objections were overruled, and exception taken by plaintiff, and book read, with warrant attached, for 1832. Deficiencies allowed Jacob Sailor for 1832, Mathew Irvine $2.90 county tax, and 90 cents state tax. Also for road tax.

The clerk proved the treasurer's sale-book for 1834; which was objected to on the ground that any sale, such as that purported to be, would be void for uncertainty; that there was no description of the land, but figures 600; that it did not embrace the land in question; that there was no boundary, no water, nor anything else stated to identify it; that a sale to the owner of land assessed in his name, or to his heirs, would not operate as such: it would be nothing but a payment of the tax, in law. These objections were overruled, and plaintiff excepted, &c.

Entry in sale book 1832, 600 acres, Mathew Irvine; county tax $2.70; road tax $3.60; sold to John M'Keehan for $85; bond given for balance.

Offered deed of Robert Kelly, treasurer, to John M'Keehan, in trust for the heirs of Mathew Irvine, dated 9th of June 1834, and bond of John M'Keehan, in trust, &c., (as above), to Robert Kelly, same date. It was objected that the deed, on the face of it, was in trust for the heirs of Mathew Irvine; the bond was in trust,

[Harper v. M'Keehan.]

and could be no lien on the land purchased. There was no bond by the heirs of Mathew Irvine, and yet by the deed they are made the owners of the land. These objections were overruled, and the plaintiff excepted. Deed and bond before described read: For a tract of unseated land in Rye township, containing 600 acres, adjoining lands of ———, assessed for 1832. Sold to John M'Keehan, Esq., in trust for the heirs of Mathew Irvine, for $85; of which $11.07½ were necessary to pay taxes and costs.

William Wilson. I was employed by Mr. Bryson to examine the land claimed by M. Irvine's heirs. He furnished a draft; and when I went on the ground I was not satisfied with it. I sent over and got this deed. Mr Harper was there at the same time. We compared the deed and draft together. They did not correspond. The draft appeared to embrace more land than was in the deed. This deed embraces the land now in dispute, together with part of another survey in the name of Hugh Carothers, lying east of and adjoining this tract.

The house in which Hamaker lived is on the Loque survey. When we ran this line as far as Irvine's heirs claimed westward, the line running south 3¼ east 190, from a C. O. to a stone heap, we ran east of the house in which Hamaker lived. The house was from 10 to 20 perches from the line. The claim of Irvine's heirs goes up to that line. Don't know whether deed goes up to that line. Don't know any paper title, unless this draft, that this deed corresponds with.

7th of October 1803, deed of Geo. Loque to P. Wolff for 49 acres 33 perches; and 3d of May 1806, deed of P. Wolff to M. Irvine, were offered for same purpose as deed from Geo. Loque and wife of 2d February 1811, to M. Irvine, and to be followed with same proof as then stated; which were objected to for the same reasons before stated; and the additional one, that the defendant failed to give the proof on which that offer was predicated; and the purpose for which it was offered was untrue, as appeared by record of evidence already given. The evidence was immaterial, because the sale under which they claimed was invalid and void. These objections were overruled, and the plaintiff excepted. The deeds were read.

William Wilson. The land described in these deeds is the same 49 acres 33 perches described in the diagram filed. Mr Harper was there when I made the survey for Irvine's heirs. When that survey was made, he got me to run some lines of the John Loque survey. We ran part of line adjoining H. Carothers, and on west end of survey adjoining Esquire White. Mr Harper assisted me to make the calculation of the Mathew Irvine claim and the division. Either Mr Woodburn or Mr Harper said they had possession of the Hamaker land, the west end of the tract, part of the west end of the John Loque tract. I recollect of running these

[Harper v. M'Keehan.]

two lines between John Loque and H. Carothers on the south side of the Carothers' survey.

Admitted that the lines of the H. Carothers survey were distinctly marked on the ground, and that it was within the M. Irvine claim.

Cross-examined—Can't say whether they said they were in possession of the whole land, or only the part on which Hamaker's house was. H. or W. told me they had possession of that house. Can't say how long ago. It was more than six months ago. Never saw Hamaker there. But the house was pointed out as the one he occupied, when we were running the lines there.

The plaintiff then gave the following evidence:

Shortes White. I have been on the Irvine tract of land frequently. I did not know of the Wolff survey; thought it was all in one. I was acquainted with the M. Irvine tract below, running north 5¼ west 120. I do not know the year exactly. Hamaker was settled on part of the J. Loque survey, and near to the Irvine tract, about 1823 or 1824. He continued there till 1836. He had a small portion cleared about his house; about 2 acres in all. Had a small stable. He farmed some trifle; raised potatoes and vegetables. Had a yoke of oxen at one time—short time— can't say what year. Had a few hogs. Very seldom had a cow. He carried on the coopering business there. He was there on the 2d of June 1836.

John M. Woodburn. In 1831, Mr White came to Carlisle to purchase this tract of land, supposing it to be theirs. They came in after I bought, and discovered the land was not theirs, but the John Loque survey. Hamaker had understood his tract was taken out of the John Loque survey, and wished to make some arrangement about it. None was made. In September 1831, Hamaker leased by parol from me. I agreed to give him $10 a year for keeping persons from cutting on the land. I gave him goods to amount, of 5 or $6 on account of the contract. He was living on it then. He was to cut no timber but as directed. In the fall of 1832 he called and requested privilege to cut timber, inasmuch as he had taken care of it. I gave him liberty to cut; and he remained there don't know how many years. He was to cut timber to an amount that would pay him for taking care of the land, and pay all the taxes. Some place about 1832 or '3, William Harkness called on me to purchase the John Loque survey from me. He said he wanted to buy it for heirs of Mr Irvine, and offered $50 for title. Two or three years after that, I asked him if he wanted to buy the title. He said no; he would not give a cent for it. Hamaker was to continue on and keep persons from cutting timber on the John Loque survey.

The defendants offered deed of George Loque to Mary Ramsay, dated 20th of December 1813, for 30 acres, more or less, adjoining John White, —— Fenacle, Mathew Irvine, and Jacob Sidle,

III. — 31                     V

[Harper v. M'Keehan.]

being part of 426½ acres patented to George Loque 29th of February 1796, called *Saint James.* Also deed, dated 22d of August 1827, of Mary Ramsay to C. Hamaker, 94 acres 137 perches, described by courses and distances, and adjoining M. Irvine, John White, Solomon Fenacle, and Jacob Sidle, no title recited; for the purpose of defining the possession of C. Hamaker, describing the land about where his house stood; to which it was objected that they were immaterial. No title was shown in George Loque. The papers themselves don't show the matter contended for, first deed being for 30 acres, and the next for 94 acres. It was not rebutting evidence. These objections were overruled, and the plaintiff excepted, and deeds were read.

Shortes White. That deed describes the land precisely where Hamaker lived. Never understood he claimed any other than that while he lived there. I know he did claim that while living there. Never knew of any agreement between him and Woodburn.

The plaintiffs requested the court to charge the jury upon the following points :

1. The deed, dated 2d of February 1811, from Loque to Irvine, conveyed no title to Irvine.

2. The deed, dated 7th of October 1803, from Loque to Wolff; and the deed of 3d of May 1806, from Wolff to Irvine, conveyed no title to Irvine.

3. The title of Irvine's heirs depends alone on the effect and validity of the treasurer's sale to M'Keehan, as they have shown no other title.

4. If Hamaker was residing on the John Loque tract, under Woodburn, in 1831 '2, at the time when the tax, under which defendants claim title, accrued, under an agreement covering the whole of it, it could not be assessed or sold as unseated, and the sale to M'Keehan would convey no title.

5. If the land assessed in name of M. Irvine, and sold to M'Keehan, was composed of the whole, or parts, of several distinct tracts of land, surveyed and held on different titles, and by different owners, the lines of which were well marked on the ground, the sale would confer no title on M'Keehan or Irvine's heirs.

6. The bond given by M'Keehan to the treasurer did not bind the land conveyed by the treasurer's deed; and therefore the sale and deed gave no title.

7. The assessment and sale under which defendants claim are vague, indefinite, and uncertain. Defendants must prove that they embrace the land in question, or fail in the defence. And if they might, or might not embrace the land in dispute, but did embrace land possibly belonging to and claimed by Irvine; and if at the time of sale Irvine's heirs knew of Woodburn's purchase of the whole Loque tract, they cannot now claim any part so embraced in the Loque tract.

[Harper v. M'Keehan.]

8. If the land was taxed in the name of M. Irvine, sold in the name of M. Irvine's heirs, (Irvine being then dead), and purchased by those heirs, the sale gives them no title; and the whole amounts to no more than a mere payment of the tax.

9. The liability of Woodburn, or his tenant, Hamaker, for the tax, or any part of it, on the Loque tract, prevented any part from being subject to sale as unseated.

The defendants requested the court to charge the jury upon the following points:

1. If the jury believe that Hamaker was in possession of a tract of land under the deed from Mary Ramsay, which did not interfere at all with the land in dispute, but was separated from it by distinct lines, his possession would not protect the land of M. Irvine from a sale for the non-payment of taxes; and would not, therefore, vitiate the sale made in 1834 to M'Keehan, the defendant.

2. That the identity of the land assessed for taxes in 1832, and sold in 1834, is a question of fact for the determination of the jury; and the mistake of the assessor in returning a greater quantity than Mathew Irvine owned, would not vitiate the sale, if the jury believe that the land in dispute was the land assessed and sold to the defendant, although it may now appear that the land only contained 401 acres 70 perches.

3. If the whole land in dispute belonged to M. Irvine, or was claimed by him under the deeds and surveys given in evidence, it was as to him one tract of land; and the assessment in his name as one tract was regular, and therefore the sale as one tract was regular.

Hepburn, President.—This ejectment was brought for the recovery of a tract of land in Rye township, in this county, containing about 200 acres. It was originally brought by J. M. Woodburn, in whom a regular commissioners' title was shown to the John Loque survey, which, it is admitted, embraced the land in dispute originally. On the 24th of September 1841, John Harper, by the agreement of the parties, was substituted; and he has shown a deed from Woodburn to him, vesting in him the legal title to the property. If the whole case stood on the commissioners' sale to Woodburn, and his deed to Harper, untrammelled by other facts, the plaintiff would be entitled to your verdict. But there are other difficulties; some legal, which we will determine, and others of fact which we submit for your decision.

Plaintiffs' 1st, 2d, and 3d points. These deeds were not read in evidence for the purpose of showing title in Irvine; nor have they been so used. And their title must depend on the effect and validity of the treasurer's sale to M'Keehan. We instruct you as here requested.

4th point, answered in the affirmative. How Hamaker was there, however, under whom he claimed, and the extent of his possession, you must determine from the whole testimony.

[Harper v. M'Keehan.]

5th point.  If the land assessed in the name of Mathew Irvine ·was composed of the whole, or parts, of different distinct tracts, as indicated by this point, the law is as here stated.  But if the facts in relation to the character of the tract of land assessed in the name of M. Irvine, are as contended for by the defendant in his sixth point, then the assessment in his name as one tract was regular, and the sale of it as one would also be regular.

6th point answered in the negative.

7th point.  Whether the land in dispute is the same with that assessed and sold in the name of M. Irvine or not, you must determine from the whole testimony.  If you are not satisfied it is the same, the defence of course fails.  The knowledge of Irvine's heirs that Woodburn had purchased the whole Loque tract certainly cannot prejudice their defence in this suit.

8th point answered in the negative.

9th point in the affirmative.

In answer to defendant's points, the court thus instructed the jury:

If the whole land was claimed by Irvine under his deeds, it was, as to him, one tract, and the assessment in his name as one tract of land would be regular; and consequently the sale of it in this particular also.

How the facts of the case are, you must determine.  Was the land in dispute assessed in the name of Irvine, and sold to the defendant by the treasurer of this county?  How was Hamaker there?  Was he in possession of any part of the land claimed by the defendant?  Had he anything to do with the Irvine claim, or was he there residing on a separate and distinct property?  These, and all other difficulties arising from the facts of the case, you must determine, and apply to the principles of law as we have stated them.  If the land was seated in 1832, the sale in 1834 would confer no title, and the plaintiff would be entitled to your verdict.  If it was not seated, and you find it the same as contended for by the defendant, the sale would be a good one and the defence must prevail.

The plaintiff excepted to the charge.

1. The court erred in admitting the deed dated 2d of February 1811.

2. In admitting the assessor's book—assessment M. Irvine 500 acres.

3. In admitting the book of sales.

4. In admitting the deed to M'Keehan, and the bond by M'Keehan.

5. In admitting the deed from Loque to Wolff, and the deed of Wolff to Irvine.

6. In admitting the deeds of Loque to Ramsay, and Ramsay to Hamaker.

7. In their answer to plaintiff's 5th point.

[Harper v. M'Keehan.]

8. In their answer to plaintiff's 6th point.

9. In their answer to plaintiff's 7th point.

10. The answers to plaintiff's 9th point, to plaintiff's 4th point, and to defendant's 1st point, and the last paragraph, are contradictory; do not explain the law on the matter involved in them, and calculated to confuse and mislead the jury.

11. In their answer to defendant's 2d point.

12. In their answer to defendant's 3d point.

*Devor* and *Alexander*, for plaintiff in error.
*Watts*, for defendant in error.

The opinion of the Court was delivered by

HUSTON, J.—Several points have occurred in this case which are new, and some not new. Since the trial of the cause, the counsel of plaintiff has discovered some facts relative to defendant's title, not known or not made known to the court and jury at the trial; and a great part of his argument here was grounded on one of these facts—i. e., the right of G. Loque to part of the land claimed by defendant. We cannot take into consideration any facts not known and passed on at the trial.

Much testimony was given as to the residence of Hamaker, and argument as to the effect of it. The deeds and parol evidence without contradiction showed that Hamaker claimed a designated quantity of land under a deed; that part of the land inclosed within his boundaries was within the survey of John Loque, and his house was on that part; but that neither his house or improved land or lines, interfered with the claim of defendants, but was separated from defendant's claim by a marked line called for by the deed of Hamaker and the deed of defendant. The case of *Campbell* v. *Wilson*, (1 *Watts* 503), and some subsequent cases, decide and settle that his possession on an adjoining tract, or even an interfering tract, distinctly separated and designated, will not avoid a sale of another tract as unseated, though the claim of the possessor may interfere with the adjoining unseated tract; but that the purchaser of the unseated tract may hold what is without the boundaries of the land so in possession of another.

All the testimony as to whether Hamaker ever was under Woodburn, and if so, how? was left to the jury and decided on by them. The case of *Morton* v. *Harris*, (9 *Watts* 319), was much urged, but it is sufficient to say it is not this case. Defendant showed a deed from G. Loque in 1811 for 352 acres by courses and distances, and also a deed from Wolff for 49 acres adjoining the other; and it was in proof that soon after a surveyor ran round the two, including them in the same survey. It was in proof by a person present at the survey and others, that this land was known as M. Irvine's land ever since, and was assessed and taxed

III. — v *

and sold as the land of his heirs, and as one tract.   Now, this is very different from assessing 4 separate tracts of different quantities, and setting a different value and laying a different tax on each, and then selling the whole 4 as one tract of a quantity made by adding the acres of the whole 4 together.

The Act of 3d of April 1804, which is the basis of our system of taxing unseated land, in its first section directs minutely that the name of the warrantee as well as owner (if the owner is known), the quantity of acres surveyed, the persons on whom it adjoins, and the waters on which it lies, shall be returned to the commissioners.   When sales were made and the title to purchaser disputed, the attention of the court was called to the provisions contained in other sections of the Act, and when they had not been complied with, or the purchaser could not prove in court that they had been complied with, the sale was declared invalid, and nothing was said about the provisions of the first section; besides the fifth section of that Act vests in the purchaser all the estate " that the real owner or owners thereof had at the time of such sale, although the land may not have been taxed and sold in the name of the real owner."   We have had no decision or none applicable to this case, on this section.   *Luffborough* v. *Parker*, (16 *Serg. & Rawle* 360), turned on advertising as the property of *Nathaniel* Luffborough, when the owner's first name was *Nathan*.

In *Burns* v. *Lyon*, (4 *Watts* 363), we have a case which, though not cited in the argument, has some bearing on this case, and which seems to have been in the mind of the court in deciding this cause.   In that case, from the report, no title was shown in any person as owner of the land.   It was assessed as 200 acres unseated, being part of a tract in possession of J. Dowling.   It would seem Dowling did not claim the part in dispute.   After the sale, some persons went into possession of the 200 acres sold, it would seem, without title; against these the alienee of the purchaser at commissioners' sale brought ejectment and recovered; and it was decided that it must be left to the jury to decide, whether the land claimed by the purchaser was the same which was assessed and sold; and they found for the purchaser at tax sale.

It is true that the point, that no owner was named in the assessment and sale, was not made: if made and decided, it might rule this case.   I know of no decision applicable to this case as regards the construction of the fifth section of the Act of 1804—" shall vest in the purchaser all the estate of the real owner, though not assessed and sold in name of real owner."   Lands were originally assessed in the name of some person: does the law mean that the title shall pass, though assessed and sold in the name of a person who was not the owner, provided it is found to be the very land which was assessed and sold?—if it do not mean this, it is nearly useless as a provision in favour of the purchaser.   Again, it happens that a tract of land is covered by two warrants; the older

[Harper v. M'Keehan.]

warrant and best title is unknown to the assessors and commissioners, but they know of the younger title, and tax and sell the land, designating it by that title; the land under that title pays its proportion of the county expenses: can the holder of the oldest title, who has paid no taxes, recover by saying it was taxed and sold in the wrong name? The construction of this section is important; it was not put in the court below, nor argued here, and perhaps must eventually decide this case. This tract was surveyed on a warrant to John Loque in 1794. There was a time when there was a presumption that the person to whom a warrant was granted was the owner; but since 1792 the chance is perhaps 1000 to 1 that the person whose name was used knew nothing about it and had not a particle of interest in it. We only hear of John Loque in the warrant and survey, and tax and sale. George Loque, a man well known, sold a part of this tract to Wolff in 1803, another part to Irvine in 1811. Whether from want of inquiry or because the inquiry was unsuccessful, it is so, that no proof was given that G. Loque entered the application or paid for the warrant or for the survey, nor any conveyance to G. Loque. The deeds from G. Loque were offered and objected to; but received, not as evidence of title, but along with other evidence to show what land Mr Irvine in his lifetime, and his heirs since, claimed. There was no error in this. In *M'Koy* v. *Dickinson College*, (4 *Serg. & Rawle* 302), and (5 *Serg. & Rawle* 254), a defendant was permitted to give in evidence a deed admitted to vest no title, to show how he claimed and the extent of his claim. There was no error in saying that if Irvine at different times purchased different parcels of contiguous land, at one time 49 acres, and again 352 acres, and called and held it as one tract, and it was taxed and sold as one tract, this alone would not invalidate the sale.

One point remains. M'Keehan took his deed from the treasurer, stating that he held it in trust for the heirs of M. Irvine; he did not give his bond for overplus in trust; his bond recited that he had taken a deed in trust, but the bond bound himself and for seven years the land.

It was held that a man who had obtained a patent for land, and suffered it to be sold as unseated and purchased himself, did not improve or strengthen his title. Where the land of minors is selling for taxes, and a friend of the family buys it in with money furnished by the family, this may apply; but if he buys with his own money and gives his own bond for part of the purchase money, and takes the title in his own name as the best way of securing himself, it is a different matter; and it is immaterial whether he has the declaration of trust put in the deed to himself, or gives them a declaration of trust on a separate paper. Until they come of age, it is unknown whether they will accept the purchase and repay his money, or refuse to pay and leave the land his; and in

[Harper v. M'Keehan.]

the mean time his title as to all the rest of the world is the same as if no trust were expressed in it. How the facts, in this case, were as to this matter, we know not. And I am not prepared to say the title of defendants is void on this account, on the facts in evidence. In many cases a purchaser of large bodies of unseated land has no deeds poll from persons whose names were used in the warrants, though he has a regular title from the person who entered the warrants and paid for them, and who paid surveying fees. And in such cases the owner has suffered the tracts or some of them to be sold, and taken a treasurer's deed, supposing it would supply the place of a deed poll from the warrantee, and intending it for no other purpose than to unite the formal legal title to the equitable one. In the land office, for many years, they have granted patents on such treasurers' deeds. And I am not aware that, in this point of view, there is anything contrary to law or justice. On the facts in this cause, and the law as laid down on the points proposed, we see no error.

Judgment affirmed.