# Morton *against* Harris.

A sale of several tracts of unseated land by the county treasurer, for the payment of taxes, as one tract, and for a gross sum, will confer no title upon the purchaser; each tract must be sold separately.

If the public sale by the treasurer of a tract of unseated land, be to one person, and the deed made to another, who gives his bond for the surplus purchase-money, a third person cannot take advantage of such irregularity.

ERROR to the common pleas of *Perry* county.

This was an action of ejectment by John H. Harris against Martin Morton and John Bear, to recover a tract of land in Rye township containing 328 acres, 51 perches.

The plaintiff gave in evidence a patent to Hugh Ferguson, dated

1st July 1786, describing the land as adjoining George Allen and Wm. M'Kee. The return of this tract of land in 1803 by the deputy surveyor to the commissioners as unseated.—21st September 1809, warrant from the commissioners to John Boden, treasurer, to sell (among others) the tract of land in the name of Hugh Ferguson, for tax of 5 dollars 20 cents:—1st January 1810, deed, John Boden, treasurer, to Christian Leonard for the Hugh Ferguson tract, 328 acres 51 perches, consideration 34 dollars.

The plaintiff then further gave in evidence the tri-annual assessment of Rye township, for the years 1811, 1812 and 1813—thus:

" Christian Leonard 100 acres, unseated, valuation 100 dollars; 300 acres, adjoining Wm. M'Kee, valuation 150 dollars; 328 acres, patented, adjoining Lewis, valuation 656 dollars; 302 acres, valuation 150 dollars; total 1030 acres.

"For the years 1814, 1815 and 1816—Christian Leonard, 300 acres unseated, valuation 600 dollars; 91 acres unseated, valuation 273 dollars; 311 acres unseated, valuation 1555 dollars; 142 acres unseated, valuation 284 dollars.

"March 22, 1824, warrant of commissioners to George M'Feely, treasurer, for the sale of unseated lands and (*inter alia*) Christian Leonard 1030 acres, taxes due, 18 dollars 97 cents. June 14, 1824, sale book of the treasurer, showing the sale of the 1030 acres, in the name of Christian Leonard to John P. Helfenstein, for 21 dollars."

The plaintiff then offered in evidence a deed from George M'Feely, treasurer, to Charles B. Penrose, Esq., dated 2d August 1824, for 1030 acres in Rye township, sold in the name of Christian Leonard for taxes due from 1810 to 1816—and the bond of Charles B. Penrose for the excess of the purchase-money above the taxes and costs. The deed is witnessed by John P. Helfenstein and acknowledged before and certified by him as prothonotary of the county.

The defendants objected to this evidence:—1. No sale of the land was made to Charles B. Penrose. 2. The treasurer had no power to convey according to any private contract, nor to accept the bond of any one but the purchaser at public sale:—and further to show by the commissioner's books (ledger of unseated land taxes E,) that the treasurer did actually sell the land at public sale to John P. Helfenstein, on the 16th June 1824. The court overruled the objections and sealed a bill of exceptions.

The plaintiff then read the deed and surplus bond, and gave in evidence a regular chain of title from Charles B. Penrose to himself.

The defendants then gave in evidence a deed from Christian Leonard to Barnet Slough, dated 1st December 1813, for the land in dispute, 328 acres 51 perches, and a regular chain of title from Barnet Slough to the defendants. The defendants moved upon the land and improved it about 1829.

The defendants' counsel requested the court to charge the jury upon the following points:

[Morton v. Harris.]

" 1. If the jury believe that in 1813, Barnet Slough was the owner or claimant of the land in dispute, by purchase from Christian Leonard, and he devised it to his children, and they conveyed it to the defendants, and the land was assessed as a separate tract in 1810, 1811, 1812, 1813, 1814, 1815 and 1816, in the name of Christian Leonard as unseated; and the treasurer sold it together with three other separate and distinct surveys or tracts of land, assessed also in the name of Christian Leonard, the whole amounting to 1030 acres as one tract, such sale is illegal and does not confer such title upon the purchaser as will enable the plaintiff to recover in this suit.

" 2. If the jury believe that the public sale of the land by the treasurer was made to John P. Helfenstein, as established by the sale book, and by the unseated land book of the commissioners, the treasurer was bound to make the deed to John P. Helfenstein, and to take the bond of John P. Helfenstein, and his making the deed to and taking the bond of any one else was unauthorized and illegal, particularly as there is no reason assigned by any proof why it was so done.

" 3. That the plaintiff has shown no other title for the tract in the name of Hugh Ferguson, than he has shown for any other of the four tracts assessed in the name of Christian Leonard: and plaintiff must show a distinct title for the land in dispute before he can recover."

In answer to which the court thus charged the jury:—

" The plaintiff has shown a patent from the commonwealth to Hugh Ferguson for the land in controversy, and there seems to be no dispute about the title being once vested in Christian Leonard; both parties claim under him.    The plaintiff claims title under a sale made by the treasurer of Cumberland county for taxes, assessed upon this property for the years 1811, 1812, 1813, 1814, 1815 and 1816; and a deed from him to Charles B. Penrose, and from him by different conveyances down to himself.    There is no dispute but that this tract was separately assessed and taxed with three others belonging to Christian Leonard in Rye township, and it is equally certain that this tract, with the three others so assessed, were sold together by the treasurer and not separately, as the defendants allege he was bound to do under the acts of assembly, authorizing the sale of land for taxes; the 1st section of the act of 1815, under which this sale was made, defines the mode in which the treasurer shall advertise, sell, &c., and affixes a penalty in case of his non-compliance.    The 3d section prevents the purchaser from given in evidence, in order to defeat the payment of the purchase-money, ' any irregularity in the assessment or proceedings of the commissioners or treasurer, touching any sale made in pursuance of this act,' &c.    The 4th section prescribes the grounds on which the title of the purchaser shall be affected.    In case a tender of the taxes shall have been made within two years, or in case the owner of the land shall have

IX.—2 c

paid the taxes due on them previously to the sale, then in either of these cases, the owner shall be entitled to recover, but in no other case, and on no other plea, shall an action be sustained, and declares that no alleged irregularity in the assessment, or in the process, or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal. 2 *Penn. Rep.* 502–3.

· " The defects complained of in the defendant's points, do not bring them within the saving provisions of this act, but are in our opinion irregularities cured by it so as to protect the title of a purchaser. We therefore answer their points in the negative."

Charge excepted to by defendants.

Errors assigned:—

1. The court erred in the admission of the deed from George M'Feely, treasurer, to Charles B. Penrose, Esq.

2. In their charge to the jury, in answer to the 1st, 2d and 3d points of the defendants.

*Watts*, for plaintiff in error, cited *Purd. Dig.* 861, act relating to the sale of unseated lands, 13 *Serg. & Rawle* 154; 1 *Watts* 503–533; 7 *Serg. & Rawle* 390.

*Reed*, for defendant in error, cited 2 *Penn. Rep.* 496.

The opinion of the court was delivered by

HUSTON, J.—Although we have, for a long series of years, had laws under which lands on which no person resided and no improvements were made, were sold for taxes, and many hundred sales have taken place, yet no instance occurs previous to 1815, in which the purchaser at a sale for taxes has succeeded in making out a good title in court, unless where the statute of limitations has come in aid of the treasurer or commissioner's deed.

· The courts having decided that, to vest a title in the purchaser of lands sold for taxes, an exact and literal compliance with every direction of the law or laws was necessary, and that, from the return of the election of the assessors, to the deed, every requisite of every act must be shown by the original written paper in each case to have been in strict conformity with the law, it became necessary not only that a purchaser should be able, at the time of his purchase, to prove all that was required, but he must be able to prove every thing for twenty-one years after his taking possession. The several offices in which the documents were kept, were not, all of them, places of record. The original return of an election, or oath of an officer, or newspapers containing the advertisement, though preserved for years, disappeared, or some one of them disappeared in a short time after the sale. The result was that few owners of unseated lands would pay taxes on them. And if a purchaser at a tax sale improved on the land, and by his labour made it valu-

[Morton v. Harris.]

able, some friendly neighbour or prowling speculator sought out the owner, and the purchaser was dispossessed. Many laws were enacted to change this, but none were effectual until the act of the 13th of March 1815. The evil complained of, and to remedy which, was the object of that law, was the necessity of producing at the trial the best evidence, not only that each requisite of the laws had been complied with substantially—that was not sufficient; but to a letter as to form, and to a day as to time. I have stated this because, without taking these things into view, some of the enactments in the law of 1815 would appear harsh and severe on the original owners, and, without adverting to these matters, we may miss the true construction of some parts of the act. The purchaser at a sale for taxes dare not spend money or labour on the land he bought, or it would certainly be taken from him, unless he could produce the requisite proof of the regularity and formality of the election, qualification, &c., of every officer who had any part in the proceeding, and proof by the production of the identical paper of the advertisements required by law. The act of 1815 was intended to dispense with this proof after a lapse of two years from the time of sale. The intention of it was to change the evidence, to substitute the presumption that every thing was rightly done, for the proof that it was rightly done.

The first cases which came before this court, after the passage of that law, were by the landholders against purchasers who had settled on the lands; and the questions decided were, how far the proof formerly required would be dispensed with. The first case is Stewart *v* Shoonefelt; it is there said the land must be unseated and a tax must be assessed. That case was tried before me, and taken to the supreme court and affirmed; but a matter admitted at the trial is not noticed, viz: that the line between the two townships had not been run until after the tract in question had been sold; and that the tract had always been assessed as in Porter township, and that Stewart's title to it was a deed on a sale for taxes in which it was assessed and sold as being in that township. The supreme court, knowing that the lines between townships in counties lately erected, and having large bodies of unseated lands, were seldom run or marked until the part became settled, chose to decide it on general grounds applicable to such cases.

In one of the next cases, Hubley *v.* Keyser, 2 *Penn. Rep.* 496, I delivered the opinion of the court, and, having the facts of that case in view, I used expressions which I would qualify. A person who became clerk of the commissioners, twelve years after the time when this land was taxed, produced a book containing a list of all the unseated lands in the county, and the amount of tax assessed on each, and stated that this was the only assessment in the office, and that no other had ever been there. On the other hand, a man of most respectable character swore he had been assessor in 1806, and had assessed the tract in question, and returned it in his list of

[Morton v. Harris.]

unseated lands to the commissioners, and gave a good reason why he recollected this tract particularly. This sale on this testimony was held to be valid, and it is said, "the object was to make the sale and deed confer a title without *proof* of any prerequisite except that the land was unseated and that a tax was charged by the commissioners, regularly or irregularly. That this tax was unpaid and the land sold and not redeemed within two years." This sentence has been supposed to bear, and perhaps if taken without reference to the facts of the case, will bear a meaning not thought of by me when I wrote it. I did not mean to say, nor do I believe the court meant, that if a tax was charged in the commissioner's book, and proof that no assessment was ever made, the sale was good, but under this law a sale may confer a title, though the assessment is not produced; so the court may hold a sale good, though no proof is made that the land was advertised as directed by law. But I did not mean, nor do I now say, that a sale may be good if there is clear proof that the land was never advertised at all. The evil complained of was the difficulty of proving the election of assessors, their having taken the prescribed oath, valued the land and duly returned it to the commissioners; then the election and qualification of the commissioners, their having directed so much per cent. to be levied, their warrant to sell, the advertisement for so many weeks in so many daily and so many weekly papers, &c. &c. The act of 1815 was intended to *dispense with proof* that every step was taken regularly; not to make a sale valid where it could be proved that no one step had been taken; and it provides that if the owner shall, within two years after the sale, pay or tender to the treasurer the taxes and costs and 25 per cent., &c. &c., or if the owner shall have paid the taxes before the sale, the owner shall be entitled to recover the land by due course of law; "but in no other case and on no other plea shall an action be sustained; and it is hereby declared that so much of the act to which this is a supplement as requires notice of the taxes being due and sale thereon to be published in certain public newspapers is repealed, and no alleged irregularity in the assessment or in the process or otherwise shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." These words are large, and mean much in the proceedings on a sale for taxes; but they do not go the length of making every possible sale valid. When any irregularity in the assessment or process is cured, it supposes there has been an assessment and has been process; and it would not seem to confirm and render valid a sale, if a treasurer should sell land never assessed, and proved never to have been assessed or included in any process. So these expressions would not, as has often been decided, render valid a sale of cultivated land: the authority is only to sell unseated land.

By the fifth section of the act of 1804, the title of the former owner is to be vested in the purchaser, though the land may not

have been taxed or sold in the name of the real owner thereof: but I apprehend the tract taxed and sold must in some way be designated so that it can be known to a reasonable certainty what specific tract was taxed and sold. This section was under consideration in Luffborough *v.* Parker, 16 *Serg. & Rawle* 351, where a tract of donation land, taxed in the name of Nathan Luffborough, was advertised and sold in the name of Nathaniel Luffborough. The sale was held to be invalid on other objections, but not on this objection. There was, however, a circumstance scarcely noticed in the report. The tract was one of the donation tracts; these tracts are all numbered, and the number is the most particular and certain designation of the tract. It was taxed and sold by the right number. The construction of this section has not often been considered; generally unseated lands have been taxed in the name to which the warrant was granted; and it seems to have been always conceded that this will be sufficient. The assessors and commissioners cannot know of all the transfers of title which take place. I do not know, however, that it has ever been supposed that a tract warranted to J. S. and sold by him to T. C. can be taxed and sold as the property of P. N. and a good title made, and I would say it could not unless there was something else in the description to distinguish what particular tract was taxed and sold.

The present case is distinguishable from any decided case in several respects. Two errors are assigned: First, that the land was struck off to Helfenstein and the deed made to Penrose. It is not, however, Helfenstein who objects to this—if he made the objection it would present a different case. The objection is from the owner of the warrant. By the act of assembly the purchaser after paying the taxes and costs is to give a bond for any overplus remaining of the sum bid after discharging the taxes and costs. This bond is by the treasurer to be filed in the office of the prothonotary of the county, and is a lien for the amount on the lands sold for five years. This seems to have been the security provided for the owner if any thing was coming to him. To be sure there could recourse be had to the other property, or to the person of the obligor on this bond; this is an incident of every bond; but the legislature seem to have thought that making the bond a lien for its amount on the land sold was a sufficient security to the owner for any overplus which might be due to him after paying the taxes and costs. In all public sales, whether by individuals or officers, it has been usual that a person bids for one who cannot attend the sale—or that the bidder transfers his bid to another who accepts and pays for the property; and, unless some thing more than this appears, we do not see that any third person can object to this.

The next objection is, that four tracts were advertised and sold together. The assessment was of four separate tracts—by adding the quantity in each together, they amount to 1030 acres—the warrant directs the treasurer to sell (among other things) 1030 acres,

IX.—2 c*

taxed as the property of Christian Leonard; the whole four tracts
were sold as one tract, and the deed is for 1030 acres. So far as
we know, this is the first instance of such a sale. In 7 *Serg. &
Rawle* 386, we find a case approaching only in part to this. Mr
Riddle had bid for 105 tracts—they had been assessed separately,
and sold separately to him; some difficulty arose between him and
the commissioners and treasurer; among other things, to save ex-
pense, as he alleged, he offered to prepare one deed for the whole
105 tracts, the treasurer refused this, and prepared and tendered
105 deeds. Mr Riddle objected to receiving the deeds, among
other reasons, because his offer to prepare one deed was refused.
In page 390, we find the opinion of the court on this matter: " The
whole process, it is said, from the return and assessment to the sale
and conveyance, are all of separate tracts. They are separate ser-
vices on such tract. The acknowledgment must be separate, the
contracts of sale as separate and unconnected, as if the sales had
been made to one hundred and five different persons."

The act of 1814 in its first section directs each deputy surveyor
to make to the commissioners a return of all unseated lands, which
returns shall include a list of the number of acres contained in each
survey, and the names and surnames of the original warrantees.
The commissioners are required to keep a book in which shall be
entered the number of acres surveyed, the name of the original
owners, &c. The second section, after directions as to advertising,
&c., directs that a sale *shall be made of the whole or any part of
each* tract, &c. The fee bill prescribes the fee for advertising *each
tract*, for selling *each tract*. The act of 1806, directs the owners
of unseated land, under the penalty of a four fold tax, to make a
return to the commissioners of *each and every tract* held by them,
and the name of the person to whom the original title from the com-
monwealth passed. The act of 1815, directs the treasurer on the
second Monday of June 1816, and every two years thereafter, to
sell *the whole or any part of each tract;* the fifth section provides
that *if any tract* of unseated land shall not have bidden for it a sum
equal to the taxes and costs, the commissioners may buy it for the
county. The form of deed prescribed by this law begins: " Whereas
*a tract of land* ——, and I the said treasurer do grant, bargain and
sell *the said tract of land,"* &c., &c. In short, the whole system of
laws on this subject contemplates an assessment, advertisement and
sale of *each tract*, and the practice has accorded therewith. It is
not known that several tracts have been advertised as one, sold as
one, and conveyed as one, in any other county. In the case of
Bedford County *v.* Riddle, before cited, the assessment, advertise-
ment and sale were of each tract separately, and the only contest
was that the purchaser of 105 tracts wished to comprise them all in
one deed, which he offered to prepare—this the treasurer refused,
and the supreme court approved of the conduct of the treasurer in
this respect, though the sale was in another respect held invalid.

[Morton v. Harris.]

The advertisement of four tracts as one being sanctioned, it will follow that any indefinite number may be thus published as one tract. The advertisement will not, in such case, give any notice to the owner of a single tract that his land is up for sale; if this mode of advertising is sanctioned, why not allow four or forty tracts to be assessed as one, and call it only an irregularity as is done in this case?

The bond for overplus is for the security of him whose land was sold, and this bond, in some instances, is for such amount that the owner chooses to take the money bid instead of redeeming the land; but how is this to be apportioned among the different owners of different tracts? but I do not choose to put it on the inconvenience or hardship which might occur. There is no authority in any act of assembly to assess, advertise or sell in one lot more than one tract or parcel of land; and there is no reason that I can conceive why the authority or power of the county officers should in this respect be extended beyond the provisions of the laws, even if we had power to extend it.

The act of 1815, was intended to remove all the difficulties known to stand in the way of those who purchased lands sold for taxes, and this court has given, on several occasions, a construction calculated to carry into effect the legislative intent. It can hardly be supposed, however, that there was any intention to sanction new modes of proceeding never alluded to or thought of; it went on the ground that after two years from the sale every previous step should be presumed to have been legal—but if it appears clearly that the sale was without authority, as where seated lands are sold, or beyond all authority, and in violation of every legislative provision as in this case, the act of 1815 does not apply to these cases.

The gentlemen whose names occur in this sale repel all idea of intentional wrong, but we cannot help seeing that if this is supported, it may, and in some cases must, eventuate in the grossest fraud, and pervert a series of laws intended to operate fairly on all parties, into the means of gross fraud and injustice, and make them produce effects the very reverse of those intended by the law makers.

Judgment reversed.