# Heft *versus* Gephart.

1. A number of adjoining tracts warranted to different persons were conveyed in one body by courses and distances, all the warrants being recited. They were assessed in different tracts in the names of the respective warrantees and sold separately for taxes. On one, saw-mills had been erected by the owners of the whole, from which timber was to be supplied for manufacture at the mills. *Held*, that this did not constitute the whole one seated tract.

2. The tax laws as to unseated lands, treat them entirely in reference to the original warrants, when not otherwise directed by the owners.

3. The taxing officers have always gone by the surveys on warrants.

4. Portions of distinct warrants united in fact by purchase may be thus returned and assessed by whatever designation the owner may choose, and be sold as a unit.

5. A triennial assessment attached to the original assessment was brought from the commissioners' office. This was evidence of an assessment without more.

6. The tax laws prescribe no mode of keeping assessment books or that any shall be kept, excepting so far as is involved in the general direction that unseated land shall be valued, &c., as other property.

7. The maxim "*omnia præsumuntur rite esse acta*" applies to whatever method may be adopted and whatever evidence of official action may exist in the commissioners' office.

8. There is nothing to which the maxim applies with so much force as a tax title.

9. Land becomes debtor for tax by being returned, assessed and valued and the rate *per cent.* fixed; carrying out the amount of tax is merely clerical.

May 16th 1870. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Common Pleas of *Centre county :* No. 86, to May Term 1870.

This was an action of ejectment to August Term 1866 by Jacob D. Heft against J. P. Gephart for 4997 acres of land in Gregg and Penn townships. The case was tried, February 5th 1868, before Barrett, P. J., of the 22d District.

The plaintiff gave in evidence: 19 warrants of 400 acres each and surveys; patents to Thomas P. Cope in November 1796, and

[Heft *v.* Gephart.]

deed March 10th 1850 from Cope to William L. Musser. The deed to Musser described the land as "all that large body and tract of land situate, &c., consisting of sundry tracts and parts of tracts of land as by original surveys made and returned as hereinafter specified bounded," &c., then followed the courses and distances around the whole body "containing 4997 acres surveyed on warrants dated respectively on the 24th day of March 1794 to Hannah Pimm," &c., naming the warrantees. Deed December 8th 1851, W. L. Musser to Daniel A. Musser for an undivided moiety. Judgment, April 30th 1855, Philip B. Musser against William L. Musser for $2588.62. Fi. fa. to August Term 1855, and levy "on all that large body and tracts of land," and described by names of warrantees as in Musser's deed, with two large saw-mills and other buildings erected thereon. Inquisition, August 25th, extended the land at a rent of $1800 per annum at which it was retained by the defendant. The defendant having failed to pay the rent, his undivided half of the 4997 acres was sold by the sheriff to Benjamin Kemmerer, the sheriff's deed having been acknowledged November 28th 1856. He gave evidence showing that Kemmerer's title was vested in him.

The defendant claimed under a tax title to 15 of the tracts, and gave evidence of the triennial assessment in 1850 in Penn township of 16 smaller tracts in different warrantee names and of different number of acres, William L. Musser being named as owner, and of 8 tracts in different warrantee names (some the same as in the foregoing 16 tracts), Thomas P. Cope named as owner; also assessment in same year in Gregg township in the names of some of same warrantees, W. L. Musser, owner. These warrantee names were those (except one) named in the deed to Cope.

John Moran, who was clerk of the commissioners, testified that a book shown him was the assessment book for 1853, and W. H. Blair (who purchased these tracts) had access to it.

George Livingston, commissioners' clerk from 1851 to 1856 and afterwards county treasurer, testified that he made entries on a paper relating to Penn township in the book; the paper was in the office; it was attached by wafers to a page of the book. The paper was a list of tracts containing several columns, viz.: "number of acres," "warrantees' names," "valuation per acre," "valuation per tract," "owners." There were 25 tracts; 23 of these tracts were in warrantee names of land conveyed to Cope. Philip Auman, W. L. and D. Musser and T. P. Cope were named as owners. The plaintiff objected to the admission of this book with the list; it was admitted and a bill of exceptions sealed. Defendant offered "Unseated Land Book, No. 8." In this was a list containing 15 tracts in the names of same warantees. The assessment of one, William Montgomery, was in different columns, for valuation, county, road, school and state taxes; the valuation and different

[Heft *v.* Gephart.]

taxes were stated separately for the years from 1850 to 1855 including both. As to the remaining tracts there were stated only the number of acres, the names of the warrantees and the valuation of the land. The admission of this book was objected to "because there is a paper pasted on the leaf over some writing." The evidence was admitted and bill of exceptions sealed.

There was also an entry for Gregg township of somewhat similar character. On the 29th of April 1856, William Musser paid $20, on account of taxes and costs. The taxes and costs on Penn township lands amounted in the whole to $87. These lands except three, one in the name of Thomas Hamilton, were sold in separate tracts by the treasurer for taxes to W. H. Blair, in June 1856. Three of these tracts were in the names of Hannah Pimm, Jonathan Walker and Andrew Kennedy, respectively.

Livingstone testified that the paper pasted in the book was in his handwriting; the writing under it was a receipt for the $20. He added the following to the receipt:—

"Notwithstanding the above $20 was paid, the parties agreed that the lands should be sold, and they were sold to W. H. Blair, with the exception of Thomas Hamilton, Henry Antis and James Tower." This was added by witness of his own accord in consequence of a complaint made by Blair, that the receipt standing on the book would show that nearly all the tax had been paid. Blair had told witness a few days before the sale, that Musser agreed the lands should be sold. The witness interleaved in the book a tabular statement, carrying out the amounts due by each tract for the several different taxes and for the several years as in the case of the Montgomery—the Montgomery being included.

The following was written at the bottom of the statement:—

| "County tax $3.47 | | Taxes for 1852-3-4 and 5 | |
|---|---|---|---|
| Road | . 4.30 April 28, paid Wm. L. Musser | County | $6.23 |
| School | . 4.30 except Henry Curtes and | State | 12.32 |
| State | . 6.12 James Tower. | Road | 8.64 |
| | | School | 8.64 |
| | $18.19 | | |
| | JOHN H. MORRISON, Treas. | | $35.83 |
| | | Cost of advertising | 7.50 |
| | | | $43.33" |

He said, "The assessments were made for the four years in February, or March 1856, at one time I made them from the previous valuation in the book. I made the valuation from the valuations appearing on the unseated land book. The $20 remained in the treasury, and is the same which is credited on the bill. I charged the rates from the returns of the school directors and supervisors."

The defendants offered in evidence fourteen deeds, dated August 1st 1856, from the treasurer to William H. Blair, for the several

[Heft *v.* Gephart.]

tracts sold to him for taxes. The plaintiff objected to their admission, because the taxes were assessed within four or five months of the sale; because being predicated of the assessment of 1850, the taxes of that year had been overpaid by Musser; because the paper attached to the assessment of 1853 could not sustain a charge of taxes in 1856 and because the rates have not been established by legal testimony. The evidence was admitted and a bill of exceptions sealed.

John Moran, then clerk of the commissioners, was recalled. He testified that he had made search for the returns of the supervisors and school directors; it was not the habit to preserve them: Witness said, "I can find a few for the last year or two. We always made a tabular statement of the returns made for the year, in the front of the land book and did not preserve them. I can find no such returns for the years 1852–3–4 and 5."

Livingston was again called and said: "I made the assessment or charge of taxes against these lands from the returns made of the returns of the supervisors and school directors for the four years as to the rates levied."

The defendant then gave in evidence a treasurer's sale of the Hamilton, in June 1858 and traced the title to the defendant. He also gave in evidence a deed, dated February 4th 1865 from Blair to Daniel G. Bush for the 14 tracts purchased by him and deed October 3d 1865 from Bush to the defendant.

The defendant rested.

The plaintiffs called Daniel Musser, who testified: "I did not know of the sale for between six months and a year; I first learned it from Mr. Duncan. My brother then told me it was then sold, a few days before; the two years expired, I came up and redeemed my half; the Andrew Kennedy was seated in 1860, we built a mill on it, the Hannah Pimm was seated in 1852 or 1853; in one of those years we built a mill on it. The Jonathan Walker was seated before we bought it, and somebody has lived on it ever since. A family has always lived on it. Have taxes for them on the seated list. I run the mills until 1864. Have run them ever since, every year. I did this myself, being the owner of one-half. Think the Andrew Kennedy, was on the seated list in 1851. We built the mill on the Hannah Pimm, in 1851 or '52. Kemmerer has not been in possession since 1856."

The following points submitted by the plaintiff were negatived:—

7. If even the jury could find said paper writing purporting to be a valuation and return of the township assessors for the year 1853 regular, yet the absence of legal evidence of the rates fixed by the board of school directors, supervisors and the commissioners, in the said several years, is so entirely wanting, that the tax could not be said (if Mr. Livingston, defendant's own wit-

ness is to be believed) to have been due one year at the time of the sale.

8. That if the jury find from the evidence that during the years 1852, 1853, 1854 and 1855, William L. Musser and Daniel Musser were operating upon the lands, building saw-mills and manufacturing and selling lumber from the body of lands, exercising acts of ownership over the body, with one or more families actually residing upon the body of lands described in the writ, and in the deed from Cope to William L. Musser, the whole body thereof became seated, not liable to sale for taxes as unseated, and not within the jurisdiction of the commissioners as unseated land.

Judge Barrett in his charge said :—

\* \* \* "I have been asked to instruct the jury that the assessments and the charging of taxes against these tracts of land were irregular and that in law the sale is void.   But the adjudications upon the several questions raised, for too many years, stand in my way.   They are questions that must be passed upon by the jury, under the instructions of the court, so far as the law is allowed to control their action.

["The evidence is that these lands stood upon the books of the commissioners as unseated tracts.   They were so charged in 1850 and '51, and the taxes paid by the owners.   They were returned by the assessor in 1850, that being the year for the triennial assessment.   They were again returned in 1853.   The lands returned by the assessor for those townships, were transcribed into what is called the commissioners' *unseated land book,* by their authority.   They were then charged with the taxes.   A copy of that book with the names of the owners—the warrantee names—the valuation, and the taxes charged, county, state, road and school, was furnished to the treasurer for the purpose of collection. The state tax was a fixed rate by law.   The county rate was to be fixed by the commissioners.   They did charge the amount upon their books, and that was a sufficient adjudication of the rate. The road and school tax was charged by the commissioners, and the evidence is that the charge was made from rates returned to the commissioners' office by the supervisors and the school directors for the respective years ; that such returns were made and acted upon ; that it was not the custom of the commissioners to preserve such returns, and that they are not now to be found in the office.   The clerk swears that a tabular statement of the returns was made, and from the rates so returned the tax was charged. That tabular statement is not to be found.   In view of the loss of these papers, the record made, and the evidence of the clerk is sufficient to show that there was an adjudication by the proper township officers, and that the rate was fixed by them, before the taxes were entered in the same book.

[Heft *v.* Gephart.]

" We must not lose sight of what constitutes a good assessment. The acts of the township assessors; the return by them of the tract as unseated, with the valuation, are the assessment as contemplated by the Act of Assembly. When that is done the power of the assessors over the tract ceases, and therefore it must be complete. In the commissioners' office it forms the data or the basis from which the taxes are charged. The act of the commissioners is not the *assessment*. It is but the simple charging of the taxes year after year during the continuance of the assessment, and as the rates are fixed. They have no power over any of the rates except for county purposes.

" If the assessment and valuation were in the office, and the rate fixed, from which the calculation could at any time be made to ascertain the amount of the taxes, it is sufficient, notwithstanding it may not have been made and the amount carried out in the same book one whole year before the sale. It is only necessary that the assessment be made and the taxes remain due and unpaid for one year.]

[" When these lands were sold Musser was the owner. He had notice of the assessments and levy of taxes. He made an effort to pay the amount, and did pay $20 on account to the treasurer. He tried to negotiate for a postponement of the sale and failed. He knew they were sold and he knew that he had two years to redeem. Kemmerer, under whom the plaintiff claims, acquired title five months after the sale. Musser having been divested of title by a judicial sale had no interest in redeeming, and did not redeem. Kemmerer may not have known of the sale, but whose business was it to inform him? The public records would have afforded the notice." * * *

" The taxes and costs charged amounted to $43.33. Musser paid $20 upon the whole amount. It did not reach one-half of the whole amount charged. The treasurer treated it as insufficient, and sold the lands afterwards, crediting the amount upon the sales, and in this we think he did right. Only the owner could complain of such appropriation of his money, and he is silent upon the subject.]

" If, however, the jury should find that only the taxes for the year 1852 were regularly assessed and charged according to the Act of Assembly, then the payment of the twenty dollars extinguishes the whole of the taxes for that year, and the sale would be void.

" But if any portion of the taxes for either of the years remained due and unpaid for one year, it is sufficient to sustain the sale, provided the tract was unseated." * * *

The jury found for the plaintiff the undivided half of six tracts, naming them, and the whole of a seventh, except eighty acres.

The plaintiff took a writ of error. His first three assignments

were to the admissions of the evidence; 4th and 5th, the answers to the points; 6th and 7th, the parts of the charge in brackets.

*W. P. Wilson* and *H. N. McAllister* (with whom was *J. A. Beaver*), for plaintiff in error.—The seating of one tract with a view to use all, under the circumstances of this case, made all seated: Lackawanna Iron Co. *v.* Fales, 5 P. F. Smith 94; Hole *v.* Rittenhouse, 1 Casey 491; Kite *v.* Brown, 5 Barr 291; Nearhoff *v.* Addleman, 7 Casey 281.

*Orvis & Alexander, Bush & Yocum,* and *Blair & Stitzer,* for defendant in error.—Where there is evidence that land has been returned and valuation put on it one year before the sale, the sale will be sustained: Miller *v.* Hale, 2 Casey 435; Wells *v.* Smyth, 5 P. F. Smith 163; Act of April 15th 1834, § 8, Pamph. L. 512, Purd. 936, pl. 19; Laird *v.* Hiester, 12 Harris 462; Cuttle *v.* Brockway, Id. 145. Any unpaid balance of tax will support a sale: Frick *v.* Sterret, 4 W. & S. 269. The holder is bound to return a description of " each and every tract" he holds: Act of March 28th 1806, § 1, 4 Smith's L., p. 346, Purd. 990, pl. 3; Harper *v.* McKeehan, 3 W. & S. 238.

The opinion of the court was delivered, July 7th 1870, by

THOMPSON, C. J.—It was properly conceded by the learned counsel for the plaintiff in error on the argument of this case, that the several assignments of error presented but two questions, viz. : was the land in question, consisting of some fifteen separate warrants and parts of warrants, to be regarded as all one tract, and seated, because on one of them a saw-mill had been erected by the owners of the whole, with a view to use the whole to supply timber for the manufacture of lumber at the mill? And, secondly, if not, were the taxes for the tracts constituting the land in question due and unpaid, and assessed at least one whole year before the sale?

We think it a task of difficulty to frame an argument upon the laws for the assessment and collection of taxes on unseated lands, which would be even plausible, in its support of a theory that the meditated use of a body of lands, consisting of numerous distinct original surveys, would so consolidate them as to constitute one body, and in that form challenge the notice of the public officers against the public records that they were several tracts. The idea conflicts with the tax system regarding unseated lands, which treats them entirely in reference to the original warrants when not otherwise directed by the owners.

This is apparent in the provisions of the 2d section of the Act of 3d April 1804, requiring county surveyors to furnish the names of warrantees to aid the county commissioners in levying and col-

[Heft v. Gephart.]

lecting taxes, and in the supplement thereto, passed the 28th March 1806, requiring the owners to furnish a list of "*each and every tract*" of unseated lands held by them, with the name of the warrantee, under the penalty of having a fourfold tax assessed on "*every tract*" not so returned. Surveys on warrants as subdivisions of the public lands, were accessible to the taxing officers, or intended so to be by the public records, and by these the officers have ever gone, unless unseated lands have been returned by the owners by different designations.

No doubt portions of distinct warrants becoming united in fact by purchase, might be returned and assessed in this new form by whatever designation their owner might choose, and be sold as a unit: Harper v. McKeehan, 3 W. & S. 238, sustains this. Nor am I disposed to dispute the concession of the counsel of the defendant in error, which goes the length of admitting that the whole 5000 acres in this case, if returned by the owners as one tract, might have been affected by the seating of any portion of it, so as to exempt it all from sale. But it is not necessary to say that it would, for that is not this case. It remained for the years it was assessed with the taxes for which it was sold, separate and distinct tracts, so far as the public was concerned, and the assessing officers had nothing to go by, but the designation of the several warrantees. Thus it was assessed, and thus it was sold, and the titles can only be affected by those things, which affect any and all other separate and distinct surveys.

The cases cited to sustain the view of the plaintiff in error, are cases arising under the Statute of Limitations, where a large body of lands consisting of more than one tract has long been held, known and used as a unit, and for the same purpose requiring it so to be held. The argument here only derives such support for these cases as common features sometimes give to entirely dissimilar subjects; none whatever. There was not a shadow even, to show such a state of affairs here, excepting the deed from Cope to W. L. Musser, but there was no return to the taxing officers by the owners to give it any such character, if this might be. We are therefore not to be controlled by mere resemblances in cases. Without further elaboration, however, of this point, we think that all the rulings of the learned judge in relation to it were in accordance with well-settled law and practice, and must be sustained.

The other principal error discussed by the counsel for the plaintiffs in error is without merit. In most cases of tax sales the questions presented are usually mere questions of regularity. The argument here has in fact only this, to give it plausibility. But the 4th section of the Act of the 14th of March 1815 sets aside all this by declaring "that no alleged irregularity in the assessment, or in the process, or otherwise, shall be construed or

taken to affect the title of the purchaser, but the same shall be deemed good and legal." The operation of this provision brings into full play the preceding portion of the section wherein it is declared, that where a tax has been assessed on unseated land, and remains due and unpaid for one whole year, and is sold, the owner may redeem the same within two years, or if the tax can be shown to have been previously paid, the owner may recover his land, "but in no other cases and on no other plea shall an action be maintained."

The pretence of payment in the case in hand was an entire failure on every ground. The amount of money sent to the treasurer by W. L. Musser, did not pay the amount due on the undivided interest he had in the land, together with the costs accrued for advertising. The treasurer was not bound therefore to receive such a partial payment on account of his interest. He ought to have paid the whole. The treasurer should have required all or none to have been paid. We need not place the decision exclusively on this ground, however, for the other ground, that the taxes had been previously paid, has not been shown to have been done in order to entitle the plaintiff to recover.

Was there a tax assessed on the lands one whole year before the sale in this case, and remained due and unpaid? It is contended that there was not; but here again the argument refers to an irregularity merely. To sustain the state and county tax, all that was necessary to be shown was the return of the triennial assessment, attached as it was to the original assessment, both for that year, and brought from the commissioners' office. It was evidence of an assessment without more: Act of 8th April 1842, § 21.

It has been held by the court, and is not to be doubted, that the tax laws prescribe no mode of keeping assessment books, or that any shall be kept, excepting so far as is involved in the general direction that unseated lands "shall be valued and assessed in the same manner as other property:" Laird *v.* Hiester, 12 Harris 462. To whatever method may be adopted in the office, and to whatever evidence of official action that may exist in the commissioners' office, the maxim *omnia præsumuntur rite esse acta* applies. There is nothing to which the maxim applies with so much force as a tax title: Cuttle *v.* Brockway, 12 Harris 145. The rate per cent. of the tax is required by law to be determined in April after the triennial assessment by the commissioners.

In the absence of proof to the contrary, the presumption becomes conclusive that it was done in the townships in which the lands in question lie. There was no proof to the contrary, and the objection to the state and county is without any force. The rate per cent. being fixed, and a valuation of the land returned, constituted an assessment.

[Heft *v.* Gephart.]

The work of calculating and carrying out the amount or sum due on each tract, was merely clerical, and could be done at any time when anybody might wish to pay the tax, or for the purpose of advertisement by the treasurer. The land was made debtor by being returned assessed and valued and the rate *per cent.* fixed. The amount was a mere arithmetical process, and subject to the maxim *id certum est quod certum reddi potest.* The valuation and return by the assessors as shown by the paper attached to the assessment book, was a question of fact left to the jury, and they found in favor of it.

The testimony in regard to the road and school taxes, if believed, and it undoubtedly was, for it was not contradicted, constituted a good assessment for township purposes, and although it may seem somewhat slovenly and irregular, it was not void. These township officers made returns of the rate per cent. levied by them on the valuation of the unseated lands in the township. This was transferred to a tabular statement of unseated lands kept in the land book for each year, says the clerk of the commissioners, and the returns were not preserved and not to be found. They were not required to be preserved. "I made the assessment," says the treasurer, "or charge of taxes against these lands, from the returns of the supervisors and school directors." That is from the tabular statement. This was not an assessment; it was the mere clerical action of carrying out the amount already assessed—a simple calculation of what the amount of the tax was—a multiplication of the rate per cent. into the valuation. The assessment was the return of the township officers; the calculation anybody could make; and applying the presumption which we are bound to make, that the township officers levied their rate per cent. and returned it when required by law, there is no room to doubt that the taxes for which these lands were sold was levied and due for more than a year before the sale, and that the sale was legal and valid. We see nothing else in the case which requires special notice, and are of opinion that the judgment ought to be affirmed.

Judgment affirmed.