**HERDER SPRING HUNTING CLUB, Appellant**

v.

**Harry and Anna KELLER, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 10, 2013.

Filed May 9, 2014.

Reargument Denied July 11, 2014.

David C. Mason, Philipsburg, for appellant.

Brian K. Marshall and Timothy A. Schoonover, State College and Laurinda J. Voelcker, Danville, for appellees.

BEFORE: DONOHUE, J., OTT, J., and PLATT, J.*

OPINION BY OTT, J.:

Herder Spring Hunting Club (Herder) appeals from the judgment entered July 12, 2011, in the Court of Common Pleas of Centre County, on the orders of September 29, 2010 and June 20, 2011, denying its motions for summary judgment and granting the heirs of Harry and Anna Keller ("Keller heirs") cross motions for summary judgment and awarding the Keller heirs fee simple ownership of the subsurface rights of the Eleanor Siddons Warrant.[1] Herder claims the trial court erred in: (1) failing to recognize that a prior sale of the land for non-payment of real estate taxes effectively rejoined the subsurface and surface rights, and (2) failing to recognize that it had obtained subsurface rights through adverse possession. After a thorough review of the submissions by the parties and *amicus curiae* briefs filed on behalf of each party, the certified record,

---

* Retired Senior Judge assigned to the Superior Court.

1. Two sets of cross-motions for summary judgment were filed and decided in this matter. The first addressed the issue of the tax sale of unseated land and the applicability of the Act of 1806. These motions were decided in favor of the Keller heirs on September 29, 2010. The second set of cross-motions, addressing the issue of adverse possession, were decided in favor of the Keller heirs on June 20, 2011. The Keller heirs entered judgment on July 12, 2012. Herder's appeal from that judgment was premature, as the Keller heirs' counterclaims remained open. *See Herder Spring v. Keller*, 60 A.3d 556 (Pa.Super.2012) (memorandum). Therefore, the appeal was quashed due to the unresolved counterclaims. On March 25, 2013, the Keller heirs withdrew their counterclaims, and this appeal was timely filed on April 23, 2013.

and relevant law, we agree with Herder's first argument. Therefore, we vacate the judgment entered July 12, 2011, on the orders of September 29, 2010 and June 20, 2011, and remand for entry of an order consistent with this decision.

We quote the factual background as stated by the trial court in its opinion and order dated September 29, 2010.

On August 14, 2008, [Herder] initiated this action by filing a Complaint in the nature of an Action to Quiet Title. [Herder] subsequently filed a First Amended Complaint on October 27, 2008. [Herder] contends a 1935 tax sale extinguished the 1899 reservation of subsurface rights by Harry and Anna Keller and conveyed fee simple title to the tax sale purchaser, Max Herr. [Herder] argues Defendants failed to report their reservation of subsurface rights as required under the Act of March 28, 1806. [Herder] also asserts it has adversely possessed the mineral rights for a period in excess of twenty-one (21) years. The adverse possession claim has not been addressed by either party in the Motions for Summary Judgment.[2]

This suit arises out of a dispute over subsurface rights. In 1894, Defendant Harry and Anna Keller[1] acquired a tract of "unseated[2]" real estate containing 460 acres strict measure, known as the Eleanor Siddons Warrant[3] (hereinafter also referred to as the "property") at a tax sale. On June 20, 1899, the Kellers transferred the surface rights of the property to Isaac Beck, Isaiah Beck and James Fisher by deed but reserved unto themselves, their heirs and assigns all subsurface rights therein:

1. Harry Keller served as a Court of Common Pleas Judge in Centre County, Pennsylvania. Judge Keller served from 1926 to 1927.

2. The distinction of seated and unseated land was part of Pennsylvania tax assessment law prior to 1961. Unseated land was unoccupied and unimproved whereas seated land contained permanent improvements as indicate a personal responsibility for taxes. *See Hutchinson v. Kline,* 199 Pa. 564, 49 A. 312 (1901).

[e]xcepting and reserving unto the said parties of the first part, their heirs and assigns forever all the coal, stone, fire clay, iron ore and other minerals of whatever kind, oil and natural gas lying or being, or which may now or hereafter be formed or contained in or upon the said above mentioned or hereafter be formed or contained in or upon the said above mentioned or described tract of land; together with the sole and exclusive right liberty and privilege of ingress and egress unto, upon and from the said land for the purpose of examining, digging and searching for, and of mining and manufacturing any minerals oil, or natural gas found therein or thereon for market, and the transportation and removal of the same without hindrance or molestation from the said parties of the second part, there [sic] heirs executors administrators, lessees or assigns, or any of them; together with the right and privilege onto the said parties of the first part, their heirs or assigns, to take from said land such timber as may be necessary for the purposes aforesaid, and for the said purposes to build, construct or dig common roads, railroads,

2. As noted, cross-motions for summary judgment regarding Herder's adverse possession claim were subsequently filed and decided in favor of the Keller heirs.

3. "Warrant" appears to refer to the warrant the property is as described.

tramways, or monkey drifts and make all and every other improvement that may be necessary either upon or under the surface of said land, on and over which may be transported or manufactured all mineral, oil and natural gas formed in or on said land, and to erect such buildings structures and other necessary improvement thereon as the parties of the first part hereto their heirs or assigns, may deem necessary for the convenient use of working of said mines mills or works, and the manufacturing and preparing of the out put [sic] of the same for market with the right to deposit the dirt and waste from said mines, mills and works upon the surface of said land as may be necessary for convenient and for all of said foregoing uses and purposes to take and appropriate such land for their exclusive use as the said parties of the first part, their heirs or assigns may deem necessary.

The deed was recorded on August 8, 1899 in Centre County Deed Book 80, Page 878. The property was subsequently transferred on various occasions.

In February 1910, the Becks sold the property to Arthur Baird. In August of 1910, Mr. Baird sold the property to Robert Jackson and Thomas Litz. In 1922, Ralph Smith acquired the property via deed from Jackson and Litz. In November of 1935, the Centre County Commissioners acquired title to the property via Treasurers Sale. The property was offered for sale by the Treasurer for unpaid real estate taxes. No bidder bid the upset price and the Commissioners purchased the property. At the time the land was unseated. By deed dated June 3, 1941, the Centre County Commissioners sold the proper-

ty to Max Herr. Max Herr died intestate on February 2, 1944.

In 1959, [Herder was] interested in purchasing the property from Mr. Herr's widow. A title search was performed and [Herder] became aware of the reservation. [Herder's] attorney, Richard Sharp, Esquire,[3] suggested to grantor's attorney, Roy Wilkinson, Jr., Esquire,[4] that Mr. Wilkinson "cover the exception by a specific clause making the conveyance subject to all exceptions and reservations as are contained in the chain of title." (Defendant's Motion for Summary Judgment 3/11/2010 Exhibit E) [Herder's] deed dated November 30, 1959 reflected "this conveyance is subject to all exceptions and reservations as are contained in the chain of title." [Herder's] deed was recorded on April 12, 1960 at Deed Book 253, page 107.

---

3. Richard Sharpe served as a Court of Common Pleas Judge in Centre County, Pennsylvania from 1978 to 1980.

4. Roy Wilkinson, Jr. was one of the seven original judges nominated by Governor Raymond Shafer to the Commonwealth Court and confirmed by the Senate in 1971. Wilkinson served on the Court until 1981 when he was appointed a Justice of the Pennsylvania Supreme Court by Governor Richard Thornburgh.

Recently it was discovered that the property contains "a deep stratum of shale which contains natural gas." Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, 4/8/2010, at 2.

Trial Court Opinion, 9/29/2010, at 2–4.

After relevant motions for summary judgment were filed and briefed, the trial court determined that Harry and Anna Keller's reservation of subsurface rights was recorded, Herder was aware of the reservation of rights, and therefore, the Keller heirs were entitled to those rights. The trial court also rejected Herder's ad-

verse possession claim. Accordingly, the Keller heirs were awarded fee simple subsurface rights to the property originally known as the Eleanor Siddons Warrant.

Our scope and standard of review for summary judgment are well known:

Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

Summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party and resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Only when the facts are so clear that reasonable minds could not differ can a trial court properly enter summary judgment.

*Shamis v. Moon*, 81 A.3d 962, 968–69 (Pa.Super.2013) (citation omitted).

The relevant transactions herein are: (1) the 1899 horizontal severance of rights and transfer of surface rights to Beck and Fisher, (2) the acquisition of the property by the county commissioners for failure to pay taxes in 1935, (3) the sale from the commissioners to Herr in 1941, and (4) the purchase of the land in 1959 by Herder. Because of the age of these transfers, the resolution of this matter turns upon an arcane point of law, involving the interpretation of § 1 of Act of 1806, March 28, P.L.

644, 4 Sm.L. 346, retitled as 72 P.S. § 5020–409 (the Act).

72 P.S. § 5020–409 states:

It shall be the duty of every person hereafter becoming a holder of unseated lands, by gift, grant or other conveyance, to furnish to the county commissioners, or board for the assessment and revision of taxes, as the case may be, a statement signed by such holder, or his, her, or their agent, containing a description of each tract so acquired, the name of the person or persons to whom the original title from the Commonwealth passed, and the nature, number and date of such original title, together with the date of the conveyance to such holder, and the name of the grantor, within one year from and after such conveyance, and on failure of any holder of unseated lands to comply with the injunctions of this act, it shall be the duty of the county commissioners to assess on every tract of land, respecting which such default shall be made when discovered, four times the amount of the tax to which such tract or tracts of land would have been otherwise liable, and to enforce the collection thereof, in the same manner that taxes due on unseated lands are or may be assessed and collected: Provided, That nothing in this section shall be construed as giving greater validity to unexecuted land warrants than they are now entitled to, nor to the detriment of persons under legal disabilities, provided such person or persons comply with the foregoing requisitions within the time or times limited, respectively, after such disability shall be removed.

1933, May 22, P.L. 853, art. IV, § 409.[4]

The Act required persons who acquired unseated land to furnish a statement de-

---

**4.** In 2010, effective January 1, 2011, this title was repealed as it relates to counties of the second class A, third, fourth, fifth, sixth, seventh and eighth class counties. *See* 53 Pa. C.S. § 8801, *Historical and Statutory Notes.*

scribing that land to the county commissioners, or the board for the assessment and revision of taxes, so that a proper tax assessment could be levied.

However, the Section did not specifically address the situation presented in this case, where the subsurface rights to a specific parcel of land were horizontally severed [5] from the surface rights, thereby creating two estates in the same parcel of land. To understand how this severance affected the subsequent transfers of title, we must examine the state of the law, as it existed at the relevant periods.

We begin by reviewing *Morton v. Harris,* 9 Watts 319 (Pa.1840). It appears that prior to 1815, tax sales of unseated land were, originally, a suspect proposition, requiring specific proof that each and every step taken in the foreclosure and sale of the property were in "exact and literal compliance with every direction of the law or laws," *id.* at *4, including proof that all relevant tax assessors had been properly elected. These strict requirements allowed original owners to reclaim land from tax purchasers even after the purchaser had improved the land. The Act of 1815 disposed of this strict requirement of proof, substituting the "presumption that everything was rightly done, for the proof that it was rightly done." *Id.* The original owner was prevented from offering specific proof of irregularity of process, after a "lapse of two years from the time of sale." *Id.*

Seated lands, that is land which has been improved by permanent structures, were treated differently from unseated lands, land which was unimproved, because "seated lands are assessed in the name of the owners while unseated lands are assessed by survey or warrant numbers, regardless of the owners whose names if used at all are only for the purpose of description." [6] *F.H. Rockwell & Co. v. Warren County, et al.,* 228 Pa. 430, 77 A. 665–66 (1910) (superseded by statute as stated in *Coolspring Stone Supply, Inc. v. County of Fayette,* 593 Pa. 338, 929 A.2d 1150 (2007)). This statement of the law, which was applicable to the severance of rights and initial transaction in 1899,[7] highlights the necessity for informing the county commissioners of any changes to the real estate, because the commissioners, in assessing tax values to a particular warrant, are not concerned with names of the owners, only the property itself. Therefore, if the county commissioners have not been informed of the severance of surface and subsurface rights, the tax assessment is levied against the property as a whole.

The annotations to the Act (current Section 5020–409) reveal only three cases that address the issue of a tax sale of severed, unseated lands: *Hutchinson v. Kline,* 199 Pa. 564, 49 A. 312 (1901); *Williston v. Colkett,* 9 Pa. 38 (1848); and *Roaring Creek Water Co., v. Northumberland County Commissioners,* 1 Northumb. 181 (1889).

---

(Centre County is a county of the fourth class. *See* 16 P.S. § 210(4)).

**5.** Horizontally severed land separates surface from subsurface rights; vertically severed land subdivides an estate into lots.

**6.** For example, the property at issue instantly is the Eleanor Siddons Warrant, although Eleanor Siddons is a stranger to these proceedings.

**7.** *Rockwell* affirmed the Superior Court decision in *Rockwell v. Keefer,* 39 Pa.Super. 468 (Pa.Super.1909). The case addressed unseated tax assessments from 1904 through 1907 but relied upon case law such as *Lillibridge v. Lackawanna Coal Co., Limited,* 143 Pa. 293, 22 A. 1035 (1891) and *Neill v. Lacy,* 1 A. 325 (Pa.1885), which predate the 1899 transaction involved herein.

In *Williston,* the property had been vertically, not horizontally, severed. The original warrant was for 999 acres, parts had been sold, leaving the property at 600 acres. However, the property was assessed at 200 acres and taxes were paid at the improper, lower value. When a treasurer's sale took place, ostensibly for the 200 acres, it was realized that the warrant correctly listed the properly at 600 acres, and the entire tract was deemed sold. The Supreme Court noted,

> It is of some consequence in this case that Asa Mann, the owner of the 600 acres unseated, had for two years previously paid the tax assessed in the same way, and for the same number of acres, on the same tract, without informing the officers that the true number of acres unseated was 600. By the act of Assembly of 8th March, 1806, it was the duty of the holder to give the commissioners a description of the unseated land held by him; but Asa Mann did not choose to comply with the law, but rather elected to profit by a mistake in the number of acres which was to his own advantage; and he now complains with an awkward grace of injustice done. He was silent for his own advantage, when truth and the interest of the public required him to speak.

> No man who reads the assessment, can doubt the intent of the officer to assess all the land which was unseated on the warrant 4483, in the name of Wilson. Such is the obvious meaning and import of the assessment—the 200 acres were mentioned as description. But the land was identified by the number of the warrant, the name of the warrantee, and the name of the owner from who, Mann had purchased.

*Williston,* 9 Pa. at *2. The warrant listed the property at 600 acres,[8] and Mann was on notice of that fact, and had the responsibility to notify the assessors, yet he failed to do so. Because he failed to fulfill his duty under the Act, he could not take refuge in the faulty listing of the assessment. As such, he lost the entire 600 acres at the treasurer's sale, rather than the 200 acres listed on the tax assessment.[9] Even though *Williston* involves vertically severed lands, the result emphasizes the requirement that it is the owner's responsibility to provide an accurate report to the commissioners, and the failure to do so can have dire consequences.

In *Roaring Creek,* the Roaring Creek Water Company, which owned the surface rights to certain tracts of lands near its dam, sought to enjoin the treasurer's sale of that property. As a public utility, Roaring Creek contended that its land, whether used for the public benefit or not, was exempt from taxation. The trial court determined that excess lands were subject to taxation, and so four of six tracts of lands at issue were both subject to taxation and treasurer's sale. In relevant part, the trial court noted:

> All these tracts of land have been valued and assessed in the usual way as unseated lands, and, doubtless, a treasurer's sale will pass the whole title, both as to the surface and all that is beneath. I refer to this matter only to suggest, both to the county and the owners, that hereafter it might be well to value and assess the respective interests of the several owners separately. One man may have

---

**8.** It is unclear if this refers to 600 additional acres (800 total acres) or 600 total acres.

**9.** The *Williston* decision also noted the import of the Act of 1815, regarding the presumption, absent proof to the contrary, that the commissioners had acted in conformance with the law.

a distinct title to the surface, and another to that which is beneath: Brooms Legal maxims, 297, 298. I do not, however, decide that it is incumbent on the taxing officers to notice the titles of parties, but doubtless it would be convenient and just to them.

*Roaring Creek Water, Co. v. Northumberland Co. Commissioners,* 1 Northumb.L.J. at *3.

Finally, in *Hutchinson v. Kline,* 199 Pa. 564, 49 A. 312 (1901), our Supreme Court affirmed the trial court's decision that had awarded both surface and subsurface rights to a tax purchaser even though those rights had been previously severed. The commissioners had never been informed of the severance and the property had been taxed as a whole, therefore, the property was sold as a whole. The trial court stated:

By the act of the 28th of March, 1806, it is made the duty of the holder of lands to give the commissioners a description of the unseated lands held by him. *Williston v. Colkett,* 9 Pa. 38. And when the mineral rights were severed from the surface rights the plaintiffs should have given notice of this fact to the commissioners or to the assessor. It was also their duty to give the county commissioners a description of their lands as conveyed by courses and distances, if they desired to have them assessed as a whole. The tax laws as to unseated lands treat them entirely in reference to the original warrants, when

not otherwise directed by the owners. Parts of distinct warrants, united in fact by purchase, may be returned and assessed by whatever designation the owner may choose, and be held and taxed as a unit. But in order to accomplish this, it would be the duty of the owner to furnish the taxing officers with a proper description, in order that they may be assessed and taxed as a unit. *Heft v. Gephart,* 65 Pa. 510 [ (1870) ].

*Hutchinson,* 199 Pa. 564, 49 A. 312. The decision goes on to state, "The record of the deed creating a separate estate in the minerals would not be notice to the assessor or the commissioners, as they were not bound to search or examine the records." *Id.*[10]

In addition to those three cases annotated to the Act, in *Heft v. Gephart,* 65 Pa. 510 (1870), our Supreme Court confirmed that under the tax system, in place then and also relevant to the instant matter, treated unseated land "in reference to the original warrants when not otherwise directed by the owners." *Id.* at *6.

The relevant case law established that the acts taken by the commissioners regarding the tax sale were presumed to comport with applicable statutes and regulations, subject to contrary proof produced within two years of the foreclosure. The person who severed rights to unseated land was under an affirmative duty imposed by statute to inform the county commissioners or appropriate tax board of that severance, thereby allowing both portions

---

**10.** An *amicus curiae* filed in support of the Keller heirs has claimed that the Act provides a remedy for the failure to inform the commissioners of the severance of rights, that being a four-fold increase in the tax assessment. This penalty appears to be applied in those instances where the land was not sold at a Treasurer's sale. The four-fold penalty was in place when *Hutchinson* and *Roaring Creek* were decided. We have no reason to

believe that either our Supreme Court or the Northumberland County Court were unaware of the four-fold statutory provision. Although not explained in either of those decisions, that penalty was not applied. We will not retroactively apply that provision where the courts of that era did not see fit to utilize the penalty in this circumstance. It appears that the four-fold penalty was to be imposed in those situations where no tax sale had taken place.

of the property to be independently valued.[11] If information regarding the severance of rights to unseated property is not given to the commissioners, then any tax assessment for that unseated property must logically be based upon the property as a whole.

If a parcel of unseated land was valued as a whole, and the taxes on that land were not paid, thereby subjecting that property to seizure and tax sale, then all that was valued, surface and subsurface rights, were sold pursuant to any tax sale, absent proof within two years, of the severance of rights.

We apply the law to the instant facts. Because the Kellers originally obtained the property through an 1894 tax sale, they obtained the rights to the property as a whole, and the tax assessors would continue to value the property as a whole unless otherwise informed. *See Hutchinson, supra; Heft, supra.* When the property was horizontally severed in 1899, the Kellers never informed the county commissioners of their retention of the subsurface rights to the land after selling the surface rights.

Pursuant to the Act, it was their affirmative duty to do so. In 1935, the treasurer obtained the rights to the property pursuant to a treasurer's sale. Because the horizontal severance had never been reported to the commissioners, the property continued to be taxed as a whole, just as it had been when the Kellers obtained the property at tax sale. Therefore, the treasurer obtained the property as a whole and transferred it to the commissioners as a whole.

The trial court credited the Keller heirs' averment in their pleadings that the records of the severed subsurface rights were not kept by the Recorder of Deeds or were lost or destroyed. *See* Trial Court Opinion, 9/29/2010, at 7. Notwithstanding the lack of proof of notice of severance, it remains that the tax deeds do not reflect that any interest in the land less than a fee simple was ever assessed. There is nothing in the certified record to suggest that the records of Centre County were ever subject to flood, fire, or some other calamity or negligence such that it might be presumed that relevant records were lost

---

11. Appellees have argued that because there is no showing that the subsurface rights were ever independently valued, they cannot have been subject to taxation and therefore cannot be part of tax sale. This argument is unavailing. First, the import of the Act is that it allows the tax assessors the opportunity to independently assess a value to severed rights. That opportunity was never given to Centre County. One cannot say the mineral rights were never valued when the commissioners were not given the opportunity to independently value them. Next, that argument has been rejected by our Supreme Court, which stated:

> Appellant further argues that even though a taxing body purports to assess an entire mineral estate, only minerals known to exist at the time and place are actually valued by the assessors, taxed and later sold if taxes become delinquent. Acceptance of this proposition would undoubtedly lead to confusion and speculation, for no one

would know what had actually been sold. Attempts to prove that accessors [sic] did or did not know of the presence of oil or gas when they assessed 'minerals' at some point in the past would lead to protracted collateral investigation and litigation. It is true, of course, that an assessor can tax only that which had value. *Rockwell v. Warren County,* 228 Pa. 430, 77 A. 665 (1910); if no gas or oil exists, the mineral rights should not be taxed as if they did. Nevertheless, an assessment or sale believed to be improper because of overvaluation cannot be collaterally attacked fifty years later. The owner must petition immediately for exoneration. *Wilson v. A. Cook Sons Co., Supra,* 298 Pa. 85, at 92, 148 A. 63 [(1929)]. *Bannard v. New York State Natural Gas Corporation,* 448 Pa. 239, 293 A.2d 41 (1972). We note that Bannard also recognizes the requirement to promptly challenge a tax sale. *See Morton, supra.*

or destroyed. Absent such proof, we cannot presume such extraordinary events and the loss or destruction of records. The Act of 1806 placed the affirmative duty on the party who severed the rights to unseated land to report that action to the tax authorities. The law further requires we presume that all actions, such as recording and assessing severed rights, that were required to be taken were taken. Therefore, the proper assumption on the record before us is that failing any affirmative proof to the contrary, the severance of surface and subsurface rights in 1899 was never reported to the Centre County Commissioners. Therefore, when the commissioners finally sold the property in 1941 to Max Herr, they sold what had been taken, the entire property. *See Hutchinson, supra.* We note that neither the 1936 deed [12] transferring title from the County Treasurer to the County Commissioners, nor the 1941 deed transferring title from the Commissioners to Herr make reference to any reservation of subsurface rights.

Pursuant to *Morton v. Harris, supra,* the Keller heirs who ostensibly took possession of the subsurface rights, had two years from the delivery of the title to Herr, the purchaser at tax sale, to make known their claim. They did not. After the two years had passed, without any challenge or amendment to the deed, any subsequent transfer of the title of the property was allowed to rely on the deed containing no reservation of subsurface rights.

Although the 1959 deed (from the Herr estate to Herder) made mention of the "conveyance being subject to all exceptions and reservations as are contained in the chain of title," there were no active exceptions or reservations in the chain of title, the horizontal severance having been extinguished more than one decade earlier. Neither the Act of 1806 nor any case law interpreting the Act allow for the preservation of a reservation of land rights through the deed only after a tax sale. We do not believe, and the Keller heirs have provided no authority for, the proposition that such general language acknowledging the possibility of exceptions or reservation serves to re-sever that which had been united.

Finally, we are aware that our resolution of this matter is at odds with modern legal concepts. This resolution may be seen as being unduly harsh. However, at the time of the relevant transactions—the seizure of the property for failure to pay tax and the subsequent Treasurer's sale—this was the appropriate answer. We do not believe it proper to reach back, more than three score years, to apply a modern sensibility and thereby undo that which was legally done. [13]

Judgment orders granting summary judgment and awarding subsurface rights in favor of appellees is vacated. This matter is remanded to the trial court to enter summary judgment and award subsurface rights in favor of appellant, Herder. Jurisdiction relinquished.

---

12. While the Treasurer obtained the rights to the land in November 1935, the Treasurer's Office did not formally transfer the property to the County until June, 1936.

13. Because of our resolution of this matter, we need not address Herder's claim of adverse possession. However, we note from our review of the certified record, it appears that this claim would fail, as there was a two-month gap from November 16, 1983 to January 11, 1984 in the leases.